**RAGNAR BENSON, INC.**

**v.**

**Jacob G. KASSAB, J. G. Kassab, Inc., and Jones & Laughlin Steel Corporation.**

**Nos. 14339, 14384.**

United States Court of Appeals Third Circuit.

Argued Sept. 27, 1963.

Decided Dec. 18, 1963.

James D. Morton, Pittsburgh, Pa. (David B. Buerger, Rex Rowland, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., on the brief), for Ragnar Benson, Inc., appellant in No. 14,339.

James P. McArdle, Pittsburgh, Pa. (James E. McLaughlin, McArdle, Harrington & McLaughlin, Pittsburgh, Pa., on the brief), for Jacob G. Kassab and J. G. Kassab, Inc., appellants in No. 14,-384 and appellees in 14,339.

David McNeil Olds, Pittsburgh, Pa. (William T. Marsh, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for Jones & Laughlin Steel Corp., appellee in No. 14,339.

Rex Rowland, Pittsburgh, Pa. for Ragnar Benson, Inc., appellee in No. 14,384.

Before MARIS, KALODNER and GANEY, Circuit Judges.

MARIS, Circuit Judge.

These are cross appeals in an action brought in the District Court for the Western District of Pennsylvania by the plaintiff, Ragnar Benson, Inc., against the defendants Jacob G. Kassab, J. G. Kassab, Inc., and Jones & Laughlin Steel Corporation seeking a judgment in the amount of $541,424.00, the amount by which the defendants were allegedly enriched through the diversion of a corporate opportunity to the Kassab corporation by Kassab, a former officer of the plaintiff corporation. The defendant Jones & Laughlin was charged with knowingly, actively participating in the breach of trust. Jurisdiction was grounded on the diverse citizenship of the parties.

Involved is a contract for the construction of two warehouses at Jones & Laughlin's works at Cleveland, Ohio; the time was the winter of 1958–1959 when Jones & Laughlin had a pressing need for additional warehouse space because of an increase in steel orders in anticipation of a prospective steel strike. The plaintiff, an Illinois corporation engaged in the construction business, maintained offices in Pittsburgh which were managed by Kassab, then a vice-president and director of the plaintiff corporation. Kassab had obtained construction contracts for plaintiff from Jones & Laughlin and others and had an excellent reputation for his ability to perform such contracts

expeditiously. In July 1957, more than a year prior to the events here involved, Kassab, with the plaintiff's approval, had become an unpaid consultant to Jones & Laughlin in connection with its construction projects.

Early in October 1958 Jones & Laughlin asked Kassab to estimate the cost of constructing two warehouses in Cleveland. Kassab directed Gay E. Bodick, the plaintiff's estimator, as well as other personnel of the plaintiff, to work on the estimate and to attend meetings in respect to the project. At the end of October, Kassab asked John W. Lindsey, vice-president of Jones & Laughlin in charge of purchasing, whether he might bid on the warehouse project on his own behalf and Kassab was told it was satisfactory with Jones & Laughlin provided Kassab cleared the matter with the plaintiff. On November 4th Jones & Laughlin received an estimate prepared by Bodick upon stationery of Tristate Construction Service Corporation, a corporation owned by Kassab the name of which shortly thereafter was changed to J. G. Kassab, Inc., one of the present defendants. The contract in the amount of $2,365,675.00 was orally awarded to Kassab's corporation on November 12, 1958 and on February 6, 1959 a written contract was executed between Jones & Laughlin and Kassab's corporation. When the contract was awarded on November 12th Kassab assured Lindsey that he had cleared the matter with the plaintiff and that it was all right with the plaintiff for Kassab to bid on the job on his own account. Jones & Laughlin made no inquiry of the plaintiff as to whether it was all right to do business with Kassab individually.

On or about November 4th, prior to the award of the contract, Kassab told Raymond L. Benson, the plaintiff's president and chief executive officer, of his intention to resign and subsequently he submitted to the plaintiff his written resignation dated November 8th. Kassab had shown Lindsey his written resignation on or about November 8th. On December 1, 1958, when Benson came to Pittsburgh to deal with the problem

created by Kassab's resignation, Kassab told Benson that he had secured the Jones & Laughlin contract for himself. Benson also learned that Bodick had attended the construction meetings. It was Benson's understanding that only the engineering portion of the project had been completed at that time and that construction work had not as yet started. The following day, December 2d, Benson visited Avery Adams, president of Jones & Laughlin. Benson testified that his purpose in making the visit was to see whether Adams knew about the contract, to tell Adams he was "a little disappointed" in the way in which it was handled, and to make him aware of the fact that plaintiff had lost the job. Benson admitted, however, that he did not say to Adams that the job actually belonged to the plaintiff. Eight days later, on December 10th, Benson visited Lindsey but did not make any claim to the contract for the plaintiff. During this period Bodick, with Benson's knowledge, attended construction meetings with respect to the Jones & Laughlin contract in Cleveland on December 5th, 8th and 15th. On December 10th Bodick replaced Kassab as vice-president in charge of the Pittsburgh office and on December 15th, when Kassab's resignation was accepted by plaintiff's board of directors, Bodick replaced Kassab on the board. The construction work proceeded and was substantially completed in late April. Benson again met with both Adams and Lindsey in April 1959 when, according to his testimony, he was very careful in his "choice of words" and he did not say that plaintiff contemplated legal action against Jones & Laughlin but told them that legal action was contemplated against Kassab because of the loss of the contract. Benson also met with Kassab on several occasions but made no demand in respect to the contract until May 5th when the plaintiff, through its counsel, notified both the Kassab defendants and Jones & Laughlin that they would be held responsible for the profits made on the project. Progress payments had been made by Jones & Laughlin to Kassab's

corporation to cover operating expenses but Jones & Laughlin retained approximately $236,072.00, about 10% of the contract price. On May 25th the present suit was instituted.

Trial was had to a jury. At the conclusion of the plaintiff's case, each of the defendants moved for a directed verdict. The trial judge granted Jones & Laughlin's motion for a directed verdict but denied the motions of the Kassab defendants. Thereupon Kassab and his corporation rested, and the action as against them was submitted to the jury which returned a verdict in favor of the plaintiff in the amount of $118,289.00, upon which judgment was entered. Thereafter, the plaintiff filed motions for a new trial as to all the defendants, which were denied. Both the Kassab defendants moved for judgment n. o. v. which motions were also denied. These appeals followed.

 We consider first the plaintiff's contention that the verdict against the Kassab defendants was inadequate and that the court erred in denying a new trial on that ground. It is well settled that the courts will indulge all presumptions in favor of the validity of a verdict.[1] Generally, the grant of a new trial on the ground of the inadequacy of the verdict is for the trial court and its action will not be overruled unless discretion was abused[2] or unless it is clear that the jury's verdict was influenced by partiality, passion or prejudice or by some misconception of the law.[3] With these principles in mind, we consider briefly the evidence which was before the jury on the question of damages. In a pretrial statement, referred to during the trial, the amount of profits was stated by the plaintiff as $700,000.00, to which counsel for the plaintiff in his opening statement added $125,000.00 interest. The plaintiff contends that it proved profits in the

amount of $442,851.00, the difference between $2,438,419.00 which Lindsey testified was the gross amount received and to be received by Kassab from the Cleveland job, and $1,995,568.00 which one of plaintiff's counsel testified that his examination disclosed was the amount of defendants' expenditures on the job. The defendants, over objection of the plaintiff produced a letter dated June 22, 1959 to show that Kassab and Jones & Laughlin had agreed that the profits were to be limited to 10% of the contract price of $2,365,675.00, which would be $236,567.50. The plaintiff now contends that this figure represented the liquidated and undisputed amount of profits to which it was, at the very least, entitled and that the jury in returning a verdict for $118,289.00 improperly compromised the undisputed amount to which the plaintiff was entitled in disregard of the instructions of the trial judge that the measure of damages "consists simply of the difference between the amounts received and to be received by the defendant on the one hand and the amount of their expenditures on the other."

If it were true that the evidence pointed conclusively to $236,567.50 as the precise amount of profit realized by Kassab and his corporation on the contract and if the trial judge had instructed the jury that the amount thus established should be awarded as damages if the defendants were found to be liable, the plaintiff's argument that the verdict for one-half the amount must be set aside as an improper compromise, and the cases it cites in support of that proposition, might be persuasive. But the fact is that the evidence as to the amount of profit is far from precise and indisputable, while the plaintiff's argument ignores the fuller instructions which the trial judge later gave to the jury. For it appears that after the jury had retired it asked the

1. See Stetson v. Stindt, 3 Cir. 1922, 279 F. 209, 210, 23 A.L.R. 302.

2. Fairmount Glass Works v. Cub Fork Coal Co., 1933, 287 U.S. 474, 481–482, 53 S.Ct. 252, 77 L.Ed. 439, 443–445; George E. Keith Co. v. Abrams, 3 Cir. 1930, 43 F.2d

557; Carpenelli v. Scranton Bus Co., 1944, 350 Pa. 184, 187, 38 A.2d 44, 45.

3. Springer v. J. J. Newberry Co., D.C.Pa., 1951, 94 F.Supp. 905, 907, aff. 3 Cir. 1951, 191 F.2d 915.

trial judge for further instructions on this subject. Thereupon, in open court and in the presence of counsel, the trial judge stated to the jury, inter alia:

"\* \* \* So, the best that I can answer your questions is, first, that your verdict should be in a dollar amount and, second, that it is your sole responsibility and you are to exercise your common sense and your best discretion in determining what the amount of unjust enrichment, if any, there was in this case. Whether you arrive at it through the application of percentages is your business. The method of arriving at it is for you and you alone and as a mater of fact, your deliberations are all to be kept secret among yourselves. It is nobody else's business. So, I cannot specifically tell you how you shall arrive at any figure, should you see fit to arrive at any figure. I can only restate the considerations that may lead you to a proper consideration of this measure. And again, what was the unjust enrichment, if any, established by a preponderance of the evidence in this case after giving all of the evidence, all the facts and circumstances careful consideration. I don't think I can go any further than that \* \*."

The plaintiff raised no objection to the foregoing instruction when it was given to the jury, nor does it now contend that the instruction was wrong. On the contrary, it entirely ignores it.

The District Court concluded that the jury's verdict was neither arbitrary nor capricious and that, on the contrary, it was a fair resolution of a difficult and complicated case. We are in full accord with this conclusion.

We are not impressed by the plaintiff's argument that the jury's verdict was, somehow, improperly influenced by the trial judge's instruction that estoppel would be a good defense to the plaintiff's claim if its elements, which the trial judge outlined, were established by the preponderance of the evidence. For the jury, in finding the Kassab defendants liable to the plaintiff, obviously rejected all of the Kassab defenses, including estoppel.

The plaintiff's next contention is that the district court erred in granting Jones & Laughlin's motion for a directed verdict and thereafter in denying plaintiff a new trial of its claim against that defendant. It argues that under the rule applied by us in Higgins v. Shenango Pottery Company,[4] Jones & Laughlin must be held to have been put upon inquiry as to Kassab's authority to state that the plaintiff had approved his taking the contract. Accordingly, it argues, the question whether Jones & Laughlin knew or should have known that Kassab was breaching his duty to the plaintiff was a question which should have been submitted to the jury.

There might be force to the plaintiff's argument in this regard if the events which occurred on November 12th, when Jones & Laughlin awarded Kassab the contract upon his assurance that he had cleared the matter with plaintiff, were the only facts relating to the contract and its award to be considered. But what happened during the period December 1st to 15th, before, as Benson testified, construction had been started, makes it clear that the plaintiff was precluded from asserting that Jones & Laughlin's failure to make inquiry was evidence of bad faith. It will be recalled that Benson learned of the contract award on December 1st and on the following day he visited the president of Jones & Laughlin but made no claim to the contract, expressing merely his disappointment at the manner in which it had been handled. A week later he visited the vice-president of Jones & Laughlin and again made no claim to the contract, expressing merely that he felt the contract had been handled wrongly. During this time Bodick, with Benson's knowledge, continued to attend the construction meetings in Cleveland. Moreover, Bodick replaced Kassab on De-

4. 1958, 256 F.2d 504; 1960, 279 F.2d 46.

cember 10th in charge of the Pittsburgh office. We think the conclusion inescapable from these facts, particularly from Benson's silence as to any claim to the contract on the part of the plaintiff when he was discussing the very contract with the officers of Jones & Laughlin, that these officers had no reason to doubt Kassab's statement to them that the plaintiff had consented to his having contracted individually.

The plaintiff cites many cases for the proposition that Jones & Laughlin was under a duty to make inquiry. But in none of these instances did the wronged principal or beneficiary have notice of the wrongful act at a time when he was in a position to have averted the wrong. Here the plaintiff had the opportunity to avert the very wrong which is the basis for the present suit. But its president, Benson, chose instead to remain silent. A court will not lend its active aid to a party who by artful silence gains an unfair advantage over another.[5] Here Benson's own evidence established that the plaintiff had full opportunity to warn Jones & Laughlin and thus to enable it to save itself from liability but instead permitted Jones & Laughlin to continue in the position which the plaintiff now asserts made it liable to the plaintiff for the unjust enrichment realized by Kassab on the contract.

In the view we take, we do not reach the plaintiff's contentions that the district court wrongly applied the law of agency and trusts in directing a verdict for Jones & Laughlin.

We conclude that the district court did not err in directing a verdict in favor of Jones & Laughlin.

Nor did the district court err in denying the motions of the Kassab defendants for judgment n. o. v. We have carefully considered the arguments made by these defendants in support of their appeal but find them so wholly lacking in merit as to require no discussion here.

The judgment of the district court will be affirmed.

5. Keller v. Linsenmyer, 1927, 101 N.J.Eq. 664, 676, 139 A. 33, 39.