# TAYLOR *v.* ILLINOIS

No. 86–5963.   Argued October 7, 1987—Decided January 25, 1988

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, and SCALIA, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 419. BLACKMUN, J., filed a dissenting opinion, *post*, p. 438.

*Richard E. Cunningham* argued the cause for petitioner. With him on the briefs were *Paul P. Biebel, Jr., Robert P. Isaacson,* and *Emily Eisner.*

*Michael Shabat* argued the cause for respondent. On the brief were *Neil F. Hartigan,* Attorney General of Illinois, *Jill Wine-Banks,* Deputy Attorney General, *Roma J. Stewart,* Solicitor General, and *Joan G. Fickinger,* Assistant Attorney General.*

JUSTICE STEVENS delivered the opinion of the Court.

As a sanction for failing to identify a defense witness in response to a pretrial discovery request, an Illinois trial

*Solicitor General Fried, Assistant Attorney General Weld, Deputy Solicitor General Bryson, Paul J. Larkin, Jr.,* and *Sidney M. Glazer* filed a brief for the United States as *amicus curiae* urging affirmance.

judge refused to allow the undisclosed witness to testify. The question presented is whether that refusal violated the petitioner's constitutional right to obtain the testimony of favorable witnesses. We hold that such a sanction is not absolutely prohibited by the Compulsory Process Clause of the Sixth Amendment and find no constitutional error on the specific facts of this case.[1]

## I

A jury convicted petitioner in 1984 of attempting to murder Jack Bridges in a street fight on the south side of Chicago on August 6, 1981. The conviction was supported by the testimony of Bridges, his brother, and three other witnesses. They described a 20-minute argument between Bridges and a young man named Derrick Travis, and a violent encounter that occurred over an hour later between several friends of Travis, including petitioner, on the one hand, and Bridges, belatedly aided by his brother, on the other. The incident was witnessed by 20 or 30 bystanders. It is undisputed that at least three members of the group which included Travis and petitioner were carrying pipes and clubs that they used to beat Bridges. Prosecution witnesses also testified that petitioner had a gun, that he shot Bridges in the back as he attempted to flee, and that, after Bridges fell, petitioner pointed the gun at Bridges' head but the weapon misfired.

Two sisters, who are friends of petitioner, testified on his behalf. In many respects their version of the incident was consistent with the prosecution's case, but they testified that it was Bridges' brother, rather than petitioner, who possessed a firearm and that he had fired into the group hitting

---

[1] The Sixth Amendment provides, in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ." This right is applicable in state as well as federal prosecutions. *Washington* v. *Texas*, 388 U. S. 14, 17–19 (1967).

his brother by mistake. No other witnesses testified for the defense.

Well in advance of trial, the prosecutor filed a discovery motion requesting a list of defense witnesses.[2] In his original response, petitioner's attorney identified the two sisters who later testified and two men who did not testify.[3] On the first day of trial, defense counsel was allowed to amend his answer by adding the names of Derrick Travis and a Chicago police officer; neither of them actually testified.

On the second day of trial, after the prosecution's two principal witnesses had completed their testimony, defense counsel made an oral motion to amend his "Answer to Discovery" to include two more witnesses, Alfred Wormley and Pam Berkhalter. In support of the motion, counsel represented that he had just been informed about them and that they had probably seen the "entire incident."[4]

---

[2] Illinois Supreme Court Rule 413(d) provides in pertinent part:

"Subject to constitutional limitations and within a reasonable time after the filing of a written motion by the State, defense counsel shall inform the State of any defenses which he intends to make at a hearing or trial and shall furnish the State with the following material and information within his possession or control:

"(i) *the names and last known addresses of persons he intends to call as witnesses* together with their relevant written or recorded statements, including memoranda reporting or summarizing their oral statements, any record of prior criminal convictions known to him . . ." (emphasis added).

[3] These two men, Earl Travis, the brother of Derrick Travis, and Luther Taylor, petitioner's brother, were identified by prosecution witnesses as participants in the street fight.

[4] "During the direct testimony of the witnesses, your Honor, called by the State, I was informed of some additional witnesses which could have and probably did, in fact, see this entire incident. We at this time would ask to amend our Answer to include two additional witnesses.

"THE COURT: Who are they?

"MR. VAN: One is a guy named Alfred Wrdely of which—

"THE DEFENDANT: Excuse me, W-r-d-e-l-y.

"MR. VAN: Whose address I do not have. I'm going to have to see if I can locate him tonight. And Pam Berkhalter." App. 12.

In response to the court's inquiry about defendant's failure to tell him about the two witnesses earlier, counsel acknowledged that defendant had done so, but then represented that he had been unable to locate Wormley.[5]   After noting that the witnesses' names could have been supplied even if their addresses were unknown, the trial judge directed counsel to bring them in the next day, at which time he would decide whether they could testify.   The judge indicated that he was concerned about the possibility "that witnesses are being found that really weren't there."[6]

The next morning Wormley appeared in court with defense counsel.[7]   After further colloquy about the consequences of a violation of discovery rules, counsel was permitted to make an offer of proof in the form of Wormley's testimony outside the presence of the jury.   It developed that Wormley had not been a witness to the incident itself.   He testified that prior to the incident he saw Jack Bridges and his brother with two guns in a blanket, that he heard them say "they were after Ray [petitioner] and the other people," and that on his way home he "happened to run into Ray and them" and warned them "to watch out because they got

---

[5] "THE COURT: Yeah, but the defendant was there, and the defendant is now telling you Pam Berkhalter, and he's now telling you Alfred Wrdely. Why didn't he tell you that sometime ago?   He's got an obligation to tell you.

"MR. VAN: That is correct, Judge.   He, in fact, told me about Alfred sometime ago.   The problem was that he could not locate Alfred." *Id.*, at 12–13.

[6] "There's all sorts of people on the scene, and all of these people should have been disclosed before.

"When you bring up these witnesses at the very last moment, there's always the allegation and the thought process that witnesses are being found that really weren't there.   And it's a problem in these types of cases, and it should be—should have been put on that sheet a long time ago.

"At any rate, I'll worry about it tomorrow." *Id.*, at 13–14.

[7] The record does not explain why Pam Berkhalter did not appear.

weapons."[8] On cross-examination, Wormley acknowledged that he had first met defendant "about four months ago" (*i. e.*, over two years after the incident). He also acknowledged that defense counsel had visited him at his home on the Wednesday of the week before the trial began. Thus, his testimony rather dramatically contradicted defense counsel's representations to the trial court.

After hearing Wormley testify, the trial judge concluded that the appropriate sanction for the discovery violation was to exclude his testimony. The judge explained:

> "THE COURT: All right, I am going to deny Wormley an opportunity to testify here. He is not going to testify. I find this is a blatent *[sic]* violation of the discovery rules, willful violation of the rules. I also feel that defense attorneys have been violating discovery in this courtroom in the last three or four cases blatantly and I am going to put a stop to it and this is one way to do so.
>
> "Further, for whatever value it is, because this is a jury trial, I have a great deal of doubt in my mind as to the veracity of this young man that testified as to whether he was an eyewitness on the scene, sees guns that are wrapped up. He doesn't know Ray but he stops Ray.
>
> "At any rate, Mr. Wormley is not going to testify, be a witness in this courtroom." App. 28.

---

[8] "Q. What, if anything did you learn by standing there in the crowd?

"A. Well, Jack had a blanket. It was two pistols in there and he gave it to—

"Q. And then what, if anything, did they say at that time, if you can recall?

"A. Well, they were saying what they were going to do to the people. Say they were after Ray and the other people.

"Q. What, if anything, did you do at that time?

"A. At that time I left. I was on my way home and I happened to run into Ray and them and so I told them what was happening and to watch out because they got weapons." *Id.,* at 19.

The Illinois Appellate Court affirmed petitioner's conviction. 141 Ill. App. 3d 839, 491 N. E. 2d 3 (1986). It held that when "discovery rules are violated, the trial judge may exclude the evidence which the violating party wishes to introduce" and that "[t]he decision of the severity of the sanction to impose on a party who violates discovery rules rests within the sound discretion of the trial court." The court concluded that in this case "the trial court was within its discretion in refusing to allow the additional witnesses to testify." *Id.*, at 844–845, 491 N. E. 2d, at 7. The Illinois Supreme Court denied leave to appeal and we granted the petition for certiorari, 479 U. S. 1063 (1987).

In this Court petitioner makes two arguments. He first contends that the Sixth Amendment bars a court from ever ordering the preclusion of defense evidence as a sanction for violating a discovery rule. Alternatively, he contends that even if the right to present witnesses is not absolute, on the facts of this case the preclusion of Wormley's testimony was constitutional error. Before addressing these contentions, we consider the State's argument that the Compulsory Process Clause of the Sixth Amendment is merely a guarantee that the accused shall have the power to subpoena witnesses and simply does not apply to rulings on the admissibility of evidence.[9]

---

[9] The State also argues that we should decline to exercise jurisdiction over petitioner's Sixth Amendment claim because it was inadequately presented in the state court. As respondent points out, petitioner did not specifically articulate his claim as based on the Compulsory Process Clause until he filed a petition for rehearing in the Illinois Appellate Court. Moreover, at trial petitioner merely argued that the trial court erred by not letting his witness testify. On appeal, however, petitioner asserted that the error was constitutional: "The trial judge abused his discretion and denied [petitioner] due process by excluding a material defense witness from testifying as a sanction for a discovery violation." Brief and Argument For Appellant in No. 84–1073 (App. Ct. Ill.), p. 28. Although petitioner expressly asserted only a due process violation, his reliance on the Sixth Amendment was clear. He cited and relied upon, through a quotation from an Illinois Appellate Court decision, two of our Compul-

## II

In the State's view, no Compulsory Process Clause concerns are even raised by authorizing preclusion as a discovery sanction, or by the application of the Illinois rule in this case. The State's argument is supported by the plain language of the Clause, see n. 1, *supra*, by the historical evidence that it was intended to provide defendants with subpoena power that they lacked at common law,[10] by some scholarly comment,[11] and by a brief excerpt from the legislative history of the Clause.[12]  We have, however, consistently

---

sory Process Clause cases, *Washington* v. *Texas*, 388 U. S. 14 (1967), and *Chambers* v. *Mississippi*, 410 U. S. 284 (1973).  The state-court decision from which petitioner quoted, *People* v. *Rayford*, 43 Ill. App. 3d 283, 356 N. E. 2d 1274 (1976), was also a Compulsory Process Clause case.  The court in *Rayford* asserted that use of the preclusion sanction in criminal cases should be limited to extreme situations because in criminal cases "*due process* requires that a defendant be permitted to offer testimony of witnesses in his defense," *id.*, at 286–287, 356 N. E. 2d, at 1277 (emphasis added), citing *Washington, supra.*

A generic reference to the Fourteenth Amendment is not sufficient to preserve a constitutional claim based on an unidentified provision of the Bill of Rights, but in this case the authority cited by petitioner and the manner in which the fundamental right at issue has been described and understood by the Illinois courts make it appropriate to conclude that the constitutional question was sufficiently well presented to the state courts to support our jurisdiction.

[10] See Clinton, The Right to Present a Defense: An Emergent Constitutional Guarantee In Criminal Trials, 9 Ind. L. Rev. 711, 767 (1976).

[11] 8 J. Wigmore, Evidence § 2191, pp. 68–70 (J. McNaughton rev. 1961).

[12] "Mr. BURKE moved to amend this proposition in such a manner as to leave it in the power of the accused to put off the trial to the next session, provided he made it appear to the court that the evidence of the witnesses, for whom process was granted but not served, was material to his defence.

"Mr. HARTLEY said, that in securing him the right of compulsory process, the Government did all it could; the remainder must lie in the discretion of the court.

"Mr. SMITH, of South Carolina, thought the regulation would come properly in, as part of the Judicial system.

"The question on MR. BURKE's motion was taken and lost; ayes 9, noes 41."  1 Annals of Cong. 756 (1789).

given the Clause the broader reading reflected in contemporaneous state constitutional provisions.[13]

As we noted just last Term, "[o]ur cases establish, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania* v. *Ritchie*, 480 U. S. 39, 56 (1987). Few rights are more fundamental than that of an accused to present witnesses in his own defense, see, *e. g.*, *Chambers* v. *Mississippi*, 410 U. S. 284, 302 (1973). Indeed, this right is an essential attribute of the adversary system itself.

> "We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and

---

[13] "Particulars varied from state to state, but the provisions reflected a common principle. Three states emphasized the right to present evidence, guaranteeing the accused the right 'to call for evidence in his favour.' Two emphasized the subpoena power, giving the defendant the right to produce 'all proofs that may be favorable' to him. North Carolina combined the right to put on a defense with the right of confrontation, guaranteeing the right 'to confront the accusers and witnesses with other testimony.' Delaware emphasized the defendant's interest in sworn testimony, giving him the right 'to examine evidence on oath in his favour.' New Jersey opted for a principle of equality between the parties: '[A]ll criminals shall be admitted to the same privileges of witnesses and counsel, as their prosecutors are or shall be entitled to.' Maryland consolidated several interests, guaranteeing the defendant the right 'to examine [his] witnesses . . . on oath,' and 'to have process for his witnesses.'

"Some of the state provisions originated in English statutes, some in colonial enactments, and some were original. Regardless, they all reflected the principle that the defendant must have a meaningful opportunity, at least as advantageous as that possessed by the prosecution, to establish the essential elements of his case. The states pressed the principle so vigorously that the framers of the federal Bill of Rights included it in the sixth amendment in a distinctive formulation of their own." Westen, The Compulsory Process Clause, 73 Mich. L. Rev. 71, 94–95 (1974) (footnotes omitted).

comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." *United States* v. *Nixon*, 418 U. S. 683, 709 (1974).

The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment even though it is not expressly described in so many words:

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington* v. *Texas*, 388 U. S. 14, 19 (1967).

The right of the defendant to present evidence "stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the States." *Id.*, at 18. We cannot accept the State's argument that this constitutional right may never be offended by the imposition of a discovery sanction that entirely excludes the testimony of a material defense witness.

## III

Petitioner's claim that the Sixth Amendment creates an absolute bar to the preclusion of the testimony of a surprise witness is just as extreme and just as unacceptable as the State's position that the Amendment is simply irrelevant. The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. The Compulsory Process Clause provides him with an effective weapon, but it is a weapon that cannot be used irresponsibly.

There is a significant difference between the Compulsory Process Clause weapon and other rights that are protected by the Sixth Amendment—its availability is dependent entirely on the defendant's initiative. Most other Sixth Amendment rights arise automatically on the initiation of the adversary process and no action by the defendant is necessary to make them active in his or her case.[14] While those rights shield the defendant from potential prosecutorial abuses, the right to compel the presence and present the testimony of witnesses provides the defendant with a sword that may be employed to rebut the prosecution's case. The decision whether to employ it in a particular case rests solely with the defendant. The very nature of the right requires that its effective use be preceded by deliberate planning and affirmative conduct.

The principle that undergirds the defendant's right to present exculpatory evidence is also the source of essential limitations on the right. The adversary process could not

---

[14] As one commentator has noted:

"The defendant's rights to be informed of the charges against him, to receive a speedy and public trial, to be tried by a jury, to be assisted by counsel, and to be confronted with adverse witnesses are designed to restrain the prosecution by regulating the procedures by which it presents its case against the accused. They apply in every case, whether or not the defendant seeks to rebut the case against him or to present a case of his own. Compulsory process, on the other hand, comes into play at the close of the prosecution's case. It operates exclusively at the defendant's initiative and provides him with affirmative aid in presenting his defense." *Id.*, at 74.

function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case. The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony. Neither may insist on the right to interrupt the opposing party's case, and obviously there is no absolute right to interrupt the deliberations of the jury to present newly discovered evidence. The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.[15]

The defendant's right to compulsory process is itself designed to vindicate the principle that the "ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *United States* v. *Nixon*, 418 U. S., at 709. Rules that provide for pretrial discovery of an opponent's witnesses serve the same high purpose.[16] Discovery, like cross-examination, minimizes the risk that a judgment will be predicated on incom-

---

[15] "In the exercise of [the right to present witnesses], the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers* v. *Mississippi*, 410 U. S., at 302.

[16] "Notice-of-alibi rules, now in use in a large and growing number of States, are based on the proposition that the ends of justice will best be served by a system of liberal discovery which gives both parties the maximum possible amount of information with which to prepare their cases and thereby reduces the possibility of surprise at trial. See, *e. g.*, Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth?, 1963 Wash. U. L. Q. 279; American Bar Association Project on Standards for Criminal Justice, Discovery and Procedure Before Trial 23–43 (Approved Draft 1970); Goldstein, The State and the Accused: Balance of Advantage in Criminal Procedure, 69 Yale L. J. 1149 (1960). The growth of such discovery devices is a salutary development which, by increasing the evidence available to both parties, enhances the fairness of the adversary system." *Wardius* v. *Oregon*, 412 U. S. 470, 473–474 (1973).

plete, misleading, or even deliberately fabricated testimony. The "State's interest in protecting itself against an eleventh-hour defense"[17] is merely one component of the broader public interest in a full and truthful disclosure of critical facts.

To vindicate that interest we have held that even the defendant may not testify without being subjected to cross-examination. *Brown* v. *United States*, 356 U. S. 148, 156 (1958). Moreover, in *United States* v. *Nobles*, 422 U. S. 225 (1975), we upheld an order excluding the testimony of an expert witness tendered by the defendant because he had refused to permit discovery of a "highly relevant" report. Writing for the Court, Justice Powell explained:

> "The court's preclusion sanction was an entirely proper method of assuring compliance with its order. Respondent's argument that this ruling deprived him of the Sixth Amendment rights to compulsory process and cross-examination misconceives the issue. The District Court did not bar the investigator's testimony. Cf. *Washington* v. *Texas*, 388 U. S. 14, 19 (1967). It merely prevented respondent from presenting to the jury a partial view of the credibility issue by adducing the investigator's testimony and thereafter refusing to disclose the contemporaneous report that might offer further critical insights. *The Sixth Amendment does not confer the*

---

[17] "Given the ease with which an alibi can be fabricated, the State's interest in protecting itself against an eleventh-hour defense is both obvious and legitimate. Reflecting this interest, notice-of-alibi provisions, dating at least from 1927, are now in existence in a substantial number of States. The adversary system of trial is hardly an end in itself; it is not yet a poker game in which players enjoy an absolute right always to conceal their cards until played. We find ample room in that system, at least as far as 'due process' is concerned, for the instant Florida rule, which is designed to enhance the search for truth in the criminal trial by insuring both the defendant and the State ample opportunity to investigate certain facts crucial to the determination of guilt or innocence." *Williams* v. *Florida*, 399 U. S. 78, 81–82 (1970) (footnotes omitted).

*right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth.* Deciding, as we do, that it was within the court's discretion to assure that the jury would hear the full testimony of the investigator rather than a truncated portion favorable to respondent, we think it would be artificial indeed to deprive the court of the power to effectuate that judgment. Nor do we find constitutional significance in the fact that the court in this instance was able to exclude the testimony in advance rather than receive it in evidence and thereafter charge the jury to disregard it when respondent's counsel refused, as he said he would, to produce the report." *Id.*, at 241 (emphasis added).

Petitioner does not question the legitimacy of a rule requiring pretrial disclosure of defense witnesses, but he argues that the sanction of preclusion of the testimony of a previously undisclosed witness is so drastic that it should never be imposed. He argues, correctly, that a less drastic sanction is always available. Prejudice to the prosecution could be minimized by granting a continuance or a mistrial to provide time for further investigation; moreover, further violations can be deterred by disciplinary sanctions against the defendant or defense counsel.

It may well be true that alternative sanctions are adequate and appropriate in most cases, but it is equally clear that they would be less effective than the preclusion sanction and that there are instances in which they would perpetuate rather than limit the prejudice to the State and the harm to the adversary process. One of the purposes of the discovery rule itself is to minimize the risk that fabricated testimony will be believed. Defendants who are willing to fabricate a defense may also be willing to fabricate excuses for failing to comply with a discovery requirement. The risk of a contempt vio-

lation may seem trivial to a defendant facing the threat of imprisonment for a term of years. A dishonest client can mislead an honest attorney, and there are occasions when an attorney assumes that the duty of loyalty to the client outweighs elementary obligations to the court.

We presume that evidence that is not discovered until after the trial is over would not have affected the outcome.[18] It is equally reasonable to presume that there is something suspect about a defense witness who is not identified until after the 11th hour has passed. If a pattern of discovery violations is explicable only on the assumption that the violations were designed to conceal a plan to present fabricated testimony, it would be entirely appropriate to exclude the tainted evidence regardless of whether other sanctions would also be merited.

In order to reject petitioner's argument that preclusion is *never* a permissible sanction for a discovery violation it is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case. It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the

---

[18] *Lloyd* v. *Gill*, 406 F. 2d 585, 587 (CA5 1969) (motion for new trial based on newly discovered evidence "may not be granted unless . . . the facts discovered are of such nature that they will probably change the result if a new trial is granted, . . . they have been discovered since the trial and could not by the exercise of due diligence have been discovered earlier, and . . . they are not merely cumulative or impeaching"); *Ragnar Benson, Inc.* v. *Kassab*, 325 F. 2d 591, 594 (CA3 1963) ("[C]ourts will indulge all presumptions in favor of the validity of a verdict"); *Rowlik* v. *Greenfield*, 87 F. Supp. 997, 1001 (ED Pa. 1949) ("[N]ew trials should not be allowed simply because after the verdict the losing party has come upon some witness or information theretofore unknown to him or his attorney").

rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.[19]

A trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony.[20] Cf. *United States* v. *Nobles*, 422 U. S. 225 (1975).

The simplicity of compliance with the discovery rule is also relevant. As we have noted, the Compulsory Process Clause cannot be invoked without the prior planning and affirmative conduct of the defendant. Lawyers are accustomed to meeting deadlines. Routine preparation involves location and interrogation of potential witnesses and the serving of sub-

---

[19] See, *e. g.*, *Fendler* v. *Goldsmith*, 728 F. 2d 1181, 1188–1190 (CA9 1983) (giving consideration to the effectiveness of less severe sanctions, the impact of preclusion on the evidence at trial and the outcome of the case, the extent of prosecutorial surprise or prejudice, and whether the violation was willful).

[20] There may be cases in which a defendant has legitimate objections to disclosing the identity of a potential witness. See Note, The Preclusion Sanction—A Violation of the Constitutional Right to Present a Defense, 81 Yale L. J. 1342, 1350 (1972). Such objections, however, should be raised in advance of trial in response to the discovery request and, if the parties are unable to agree on a resolution, presented to the court. Under the Federal Rules of Criminal Procedure and under the rules adopted by most States, a party may request a protective order if he or she has just cause for objecting to a discovery request. See, *e. g.*, Fed. Rule Crim. Proc. 16(d)(1); Ill. Sup. Ct. Rule 412(i). In this case, there is no issue concerning the validity of the discovery requirement or petitioner's duty to comply with it. There is also no indication that petitioner ever objected to the prosecution's discovery request.

poenas on those whose testimony will be offered at trial. The burden of identifying them in advance of trial adds little to these routine demands of trial preparation.[21]

It would demean the high purpose of the Compulsory Process Clause to construe it as encompassing an absolute right to an automatic continuance or mistrial to allow presumptively perjured testimony to be presented to a jury. We reject petitioner's argument that a preclusion sanction is never appropriate no matter how serious the defendant's discovery violation may be.

### IV

Petitioner argues that the preclusion sanction was unnecessarily harsh in this case because the *voir dire* examination of Wormley adequately protected the prosecution from any possible prejudice resulting from surprise. Petitioner also contends that it is unfair to visit the sins of the lawyer upon his client. Neither argument has merit.

More is at stake than possible prejudice to the prosecution. We are also concerned with the impact of this kind of conduct on the integrity of the judicial process itself. The trial judge found that the discovery violation in this case was both willful and blatant.[22] In view of the fact that petitioner's counsel

---

[21] "In the case before us, the notice-of-alibi rule by itself in no way affected petitioner's crucial decision to call alibi witnesses or added to the legitimate pressures leading to that course of action. At most, the rule only compelled petitioner to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that the petitioner from the beginning planned to divulge at trial. Nothing in the Fifth Amendment privilege entitles a defendant as a matter of constitutional right to await the end of the State's case before announcing the nature of his defense, any more than it entitles him to await the jury's verdict on the State's case-in-chief before deciding whether or not to take the stand himself." *Williams* v. *Florida*, 399 U. S., at 85.

[22] The trial judge also expressed concern about discovery violations in other trials. If those violations involved the same attorney, or otherwise contributed to a concern about the trustworthiness of Wormley's 11th-hour testimony, they were relevant. Unrelated discovery violations in other litigation would not, however, normally provide a proper basis for curtailing the defendant's constitutional right to present a complete defense.

had actually interviewed Wormley during the week before the trial began and the further fact that he amended his Answer to Discovery on the first day of trial without identifying Wormley while he did identify two actual eyewitnesses whom he did not place on the stand, the inference that he was deliberately seeking a tactical advantage is inescapable. Regardless of whether prejudice to the prosecution could have been avoided in this particular case, it is plain that the case fits into the category of willful misconduct in which the severest sanction is appropriate. After all, the court, as well as the prosecutor, has a vital interest in protecting the trial process from the pollution of perjured testimony. Evidentiary rules which apply to categories of inadmissible evidence—ranging from hearsay to the fruits of illegal searches—may properly be enforced even though the particular testimony being offered is not prejudicial. The pretrial conduct revealed by the record in this case gives rise to a sufficiently strong inference that "witnesses are being found that really weren't there," to justify the sanction of preclusion.[23]

The argument that the client should not be held responsible for his lawyer's misconduct strikes at the heart of the attorney-client relationship. Although there are basic rights

---

[23] It should be noted that in Illinois, the sanction of preclusion is reserved for only the most extreme cases. In *People* v. *Rayford*, the Illinois Appellate Court explained:

"The exclusion of evidence is a drastic measure; and the rule in civil cases limits its application to flagrant violations, where the uncooperative party demonstrates a 'deliberate contumacious or unwarranted disregard of the court's authority.' (*Schwartz* v. *Moats*, 3 Ill. App. 3d 596, 599, 277 N. E. 2d 529, 531; *Department of Transportation* v. *Mainline Center, Inc.*, 38 Ill. App. 3d 538, 347 N. E. 2d 837.) The reasons for restricting the use of the exclusion sanction to only the most extreme situations are even more compelling in the case of criminal defendants, where due process requires that a defendant be permitted to offer testimony of witnesses in his defense. (*Washington* v. *Texas*, 388 U. S. 14 . . . .) 'Few rights are more fundamental than that of an accused to present witnesses in his own defense.' (*Chambers* v. *Mississippi*, 410 U. S. 284, 302 . . . .)" 43 Ill. App. 3d, at 286–287, 356 N. E. 2d, at 1277.

that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client,[24] the lawyer has — and must have — full authority to manage the conduct of the trial. The adversary process could not function effectively if every tactical decision required client approval. Moreover, given the protections afforded by the attorney-client privilege and the fact that extreme cases may involve unscrupulous conduct by both the client and the lawyer, it would be highly impracticable to require an investigation into their relative responsibilities before applying the sanction of preclusion. In responding to discovery, the client has a duty to be candid and forthcoming with the lawyer, and when the lawyer responds, he or she speaks for the client. Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forgo cross-examination, to decide not to put certain witnesses on the stand, or to decide not to disclose the identity of certain witnesses in advance of trial. In this case, petitioner has no greater right to disavow his lawyer's decision to conceal Wormley's identity until after the trial had commenced than he has to disavow the decision to refrain from adducing testimony from the eyewitnesses who were identified in the Answer to Discovery. Whenever a lawyer makes use of the sword provided by the Compulsory Process Clause, there is some risk that he may wound his own client.

The judgment of the Illinois Appellate Court is

*Affirmed.*

---

[24] See, *e. g., Brookhart* v. *Janis,* 384 U. S. 1, 7–8 (1966) (defendant's constitutional right to plead not guilty and to have a trial where he could confront and cross-examine adversary witness could not be waived by his counsel without defendant's consent); *Doughty* v. *State,* 470 N. E. 2d 69, 70 (Ind. 1984) (record must show "personal communication of the defendant to the court that he chooses to relinquish the right [to a jury trial]"); *Cross* v. *United States,* 117 U. S. App. D. C. 56, 325 F. 2d 629 (1963) (waiver of right to be present during trial).

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, dissenting.

Criminal discovery is not a game. It is integral to the quest for truth and the fair adjudication of guilt or innocence. Violations of discovery rules thus cannot go uncorrected or undeterred without undermining the truthseeking process. The question in this case, however, is not whether discovery rules should be enforced but whether the need to correct and deter discovery violations requires a sanction that itself distorts the truthseeking process by excluding material evidence of innocence in a criminal case. I conclude that, at least where a criminal defendant is not personally responsible for the discovery violation, alternative sanctions are not only adequate to correct and deter discovery violations but are far superior to the arbitrary and disproportionate penalty imposed by the preclusion sanction. Because of this, and because the Court's balancing test creates a conflict of interest in every case involving a discovery violation, I would hold that, absent evidence of the defendant's personal involvement in a discovery violation, the Compulsory Process Clause *per se* bars discovery sanctions that exclude criminal defense evidence.

I

Before addressing the merits, I pause to explicate what I take as implicit in the Court's conclusion that the defendant's constitutional claims were "sufficiently well presented to the state courts to support our jurisdiction." *Ante*, at 407, n. 9. I quite agree with the Court that the constitutional claims were not waived in the Appellate Court of Illinois, both because the defendant's appellate brief adequately presented the Sixth Amendment claim, see *ibid.*, and because the analysis in this case would essentially be the same under the Due Process Clause, see *ante*, at 406–407, n. 9. The Court does not, however, explain its conclusion that the constitutional claims were not waived at trial. I conclude that, although as a matter of Illinois law the defendant waived his federal con-

stitutional claims at trial, as a matter of federal law that waiver does not bar review in this Court.

The only legal challenge to the witness preclusion that the defendant raised at trial was one sentence in his motion for new trial stating: "The Court erred by not letting a witness for defendant testify before the Jury." Record 412. The Appellate Court of Illinois stated that the only witness preclusion issue before it on appeal was whether "the trial court abused its discretion by excluding the testimony of a defense witness as a sanction for violation of the discovery rules." 141 Ill. App. 3d 839, 841, 491 N. E. 2d 3, 4–5 (1986). The Appellate Court never addressed either the compulsory process or due process claims concerning witness preclusion, *id.*, at 844–845, 491 N. E. 2d, at 6–7, even though the briefs implicitly presented the former claim and expressly asserted the latter. This alone may not warrant the assumption that the Appellate Court implicitly held that a motion for new trial stating that "the court erred" preserved only an abuse of discretion claim and waived any constitutional claims. But the Appellate Court of Illinois had already reached that holding in an identical case. See *People* v. *Douthit*, 51 Ill. App. 3d 751, 366 N. E. 2d 950 (1977). The court in *Douthit* stated:

> "Despite appellate counsel's excellent brief on the issue of the constitutionality, as applied to a criminal defendant of that portion of Supreme Court Rule 415(g)(i) (Ill. Rev. Stat. 1975, ch. 110A, par. 415(g)(i)) authorizing exclusion of evidence for failure to comply with a discovery rule, we deem that issue, raised for the first time on appeal, to have been waived. There is nothing in the record to indicate that defense counsel ever raised any constitutional objection during the extensive in-chambers discussion summarized above, nor did he do so in his post-trial motion, which requests a new trial solely on the ground that '[t]he court erred in ruling that the defendant could not call Glen Muench and Rocky Reed to testify to defendant's state of intoxication at the time

of the commission of the alleged burglary.' *As we read this motion, it raises only the non-constitutional question whether the trial court abused its discretion in exercising the exclusion sanction.* Failure to raise an issue, including a constitutional issue, in the written motion for a new trial constitutes waiver of that issue and it cannot be urged as a ground for reversal on review." *Id.*, at 753–754, 366 N. E. 2d, at 952–953 (citations and footnotes omitted; emphasis added).

Although different districts of the Appellate Court of Illinois decided *Douthit* and this case, given that at trial both defendants presented identical challenges to the identical provision in the identical fashion, both appellate briefs raised the identical constitutional and nonconstitutional claims, and both districts considered only the abuse of discretion claim, I am constrained to conclude that in this case, like in *Douthit*, the Appellate Court of Illinois deemed the constitutional claims waived as a matter of Illinois law.

The conclusion that the Appellate Court of Illinois deemed the federal constitutional claims waived as a matter of state law does not, of course, mean that they are waived as a matter of federal law. "[W]e have consistently held that the question of when and how defaults in compliance with state procedural rules can preclude our consideration of a federal question is itself a federal question." *Henry* v. *Mississippi*, 379 U. S. 443, 447 (1965). Specifically, it is well established that where a state court possesses the power to disregard a procedural default in exceptional cases, the state court's failure to exercise that power in a particular case does not bar review in this Court. *Williams* v. *Georgia*, 349 U. S. 375, 383–384 (1955); see also *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 233–234 (1969); *Henry, supra*, at 449, n. 5. The Illinois Supreme and Appellate Courts possess such a power. Illinois Supreme Court Rule 615(a) provides: "Plain errors or defects affecting substantial rights may be noticed [on appeal] even though they were not brought to the

attention of the trial court." Those courts frequently rely on this provision to address, in their discretion, issues that have been waived at trial. See Jenner, Tone, & Martin, Historical and Practice Notes following Ill. Ann. Stat., ch. 110A, ¶615 (1985) (citing 16 appellate cases decided between 1979 and 1981 as examples of cases invoking plain error alone); see also, *e. g., People* v. *Visnack,* 135 Ill. App. 3d 113, 118, 481 N. E. 2d 744, 748 (1985) (invoking substantial rights exception despite waiver). Apparently, the Appellate Court below declined to exercise this discretion and deemed the waiver binding. Since, under *Williams* v. *Georgia,* such a decision does not bar our review, we are free to address the merits despite the state-law waiver.

## II

### A

On the merits, I start from the same premise as the Court — that the Compulsory Process Clause of the Sixth Amendment embodies a substantive right to present criminal defense evidence before a jury. See *ante,* at 408–409; see also, *e. g., Pennsylvania* v. *Ritchie,* 480 U. S. 39, 56 (1987). Although I thus join the Court in rejecting the State's argument that the Clause embodies only the right to subpoena witnesses, I cannot agree with the Court's assertion that "[t]he State's argument is supported by the plain language of the Clause." *Ante,* at 407. The Compulsory Process Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." This plain language supports the State's argument only if one assumes that the most natural reading of constitutional language is the least meaningful. For the right to subpoena defense witnesses would be a hollow protection indeed if the government could simply refuse to allow subpoenaed defense witnesses to testify. As this Court has recognized for the last 20 years, the right to subpoena witnesses must mean the right to subpoena them for a useful

purpose, and thus necessarily implies a substantive limitation on the government's power to prevent those witnesses from testifying.

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in *plain* terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's *to the jury* so it may decide where the truth lies." *Washington* v. *Texas*, 388 U. S. 14, 19 (1967) (emphasis added).

> "The Framers of the Constitution did not intend to commit the futile act of giving to a defendant the right to secure the attendance of witnesses whose testimony he had no right to use." *Id.*, at 23.

The substantive limitation on excluding criminal defense evidence secured by the plain terms of the Compulsory Process Clause is also grounded in the general constitutional guarantee of due process. See *Chambers* v. *Mississippi*, 410 U. S. 284, 298–302 (1973); see also *Rock* v. *Arkansas*, 483 U. S. 44, 51 (1987); *Crane* v. *Kentucky*, 476 U. S. 683, 690–691 (1986).

The Compulsory Process and Due Process Clauses thus require courts to conduct a searching substantive inquiry whenever the government seeks to exclude criminal defense evidence. After all, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers, supra*, at 302. The exclusion of criminal defense evidence undermines the central truthseeking aim of our criminal justice system, see *United States* v. *Nixon*, 418 U. S. 683, 709 (1974), because it deliberately distorts the record at the risk of misleading the jury into convicting an innocent person. Surely the paramount value our criminal justice system places on acquitting the innocent, see, *e. g.*, *In re Winship*, 397 U. S. 358 (1970), demands close scrutiny of any law preventing the jury from hearing evidence fa-

vorable to the defendant. On the other hand, the Compulsory Process Clause does not invalidate every restriction on the presentation of evidence. The Clause does not, for example, require criminal courts to admit evidence that is irrelevant, *Crane, supra,* at 689–690, testimony by persons who are mentally infirm, see *Washington* v. *Texas, supra,* at 23, n. 21, or evidence that represents a half-truth, see *United States* v. *Nobles,* 422 U. S. 225, 241 (1975). That the inquiry required under the Compulsory Process Clause is sometimes difficult does not, of course, justify abandoning the task altogether.

Accordingly, this Court has conducted searching substantive inquiries into the rationales underlying every challenged exclusion of criminal defense evidence that has come before it to date. That scrutiny has led the Court to strike as constitutionally unjustifiable "rules that prevent whole categories of defense witnesses from testifying on the basis of *a priori* categories that presume them unworthy of belief," such as a rule against introducing the testimony of an alleged accomplice, *Washington* v. *Texas, supra,* at 22–23; an application of the hearsay rule to statements that "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability," *Chambers, supra,* at 300; the exclusion of evidence bearing on the credibility of a voluntary confession, *Crane, supra,* at 688–691; and a *per se* rule excluding all posthypnosis testimony, *Rock, supra,* at 56–62. Based on a thorough review of the relevant case law, this Court defined the standard governing the constitutional inquiry just last Term in *Rock* v. *Arkansas,* concluding that restrictions on the right to present criminal defense evidence can be constitutional only if they " 'accommodate other legitimate interests in the criminal trial process' " and are not "arbitrary or disproportionate to the purposes they are designed to serve." *Rock* v. *Arkansas, supra,* at 55–56, quoting *Chambers, supra,* at 295.[1]

---

[1] Although the Court in *Rock* was addressing the specific issue of the defendant's right to offer his own testimony, it derived the standard it articu-

## B

The question at the heart of this case, then, is whether precluding a criminal defense witness from testifying bears an arbitrary and disproportionate relation to the purposes of discovery, at least absent any evidence that the defendant was personally responsible for the discovery violations. This question is not answered by merely pointing out that discovery, like compulsory process, serves truthseeking interests. Compare *ante*, at 411–412. I would be the last to deny the utility of discovery in the truthseeking process. See Brennan, The Criminal Prosecution: Sporting Event or Quest for Truth?, 1963 Wash. U. L. Q. 279. By aiding effective trial preparation, discovery helps develop a full account of the relevant facts, helps detect and expose attempts to falsify evidence, and prevents factors such as surprise from influencing the outcome at the expense of the merits of the case. But these objectives are accomplished by compliance with the discovery rules, not by the exclusion of material evidence. Discovery sanctions serve the objectives of discovery by correcting for the adverse effects of discovery violations and deterring future discovery violations from occurring. If sanctions other than excluding evidence can sufficiently correct and deter discovery violations,[2] then there is no reason to resort to a sanction that itself constitutes "a conscious mandatory distortion of the fact-finding process whenever applied." Weinstein, Some Difficulties in Devising Rules for

---

lated from general compulsory process case law on the theory that the right to present one's own testimony extended at least as far as the right to present the testimony of others. 483 U. S., at 52–53.

[2] Illinois Supreme Court Rule 415(g) alone supplies a broad array of available discovery sanctions:

"(i) If . . . a party has failed to comply with an applicable discovery rule . . . the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances.

"(ii) Wilful violation by counsel of an applicable discovery rule . . . may subject counsel to appropriate sanctions by the court."

Determining Truth in Judicial Trials, 66 Colum. L. Rev. 223, 237 (1966).

(1)

The use of the preclusion sanction as a corrective measure—that is, as a measure for addressing the adverse impact a discovery violation might have on truthseeking in the case at hand—is asserted to have two justifications: (1) it bars the defendant from introducing testimony that has not been tested by discovery, see *ante*, at 411–413; and (2) it screens out witnesses who are inherently suspect because they were not disclosed until trial, see *ante*, at 413–416. The first justification has no bearing on this case because the defendant does not insist on a right to introduce a witness' testimony without giving the prosecution an opportunity for discovery. He concedes that the trial court was within its authority in requiring the witness to testify first out of the presence of the jury, and he concedes that the trial court could have granted the prosecution a continuance to give it sufficient time to conduct further discovery concerning the witness and the proffered testimony. See Brief for Petitioner 18–19. He argues only that he should not be completely precluded from introducing the testimony.

*Nobles* and *Brown* v. *United States*, 356 U. S. 148, 156 (1958) are thus inapposite. Compare *ante*, at 412–413. In *Nobles* the defendant sought to impeach the credibility of prosecution witnesses with testimony from a defense investigator regarding statements those witnesses had made in interviews with the investigator. 422 U. S., at 227–229. The trial court ruled that the investigator could not testify unless the defense disclosed the report the investigator had written summarizing the interviews. *Ibid.* This Court properly rejected the defendant's claim that his right to compulsory process had been violated because:

> "The District Court did not bar the investigator's testimony. Cf. *Washington* v. *Texas*, 388 U. S. 14, 19 (1967).

It merely prevented respondent from presenting to the jury a partial view of the credibility issue by adducing the investigator's testimony and thereafter refusing to disclose the contemporaneous report that might offer further critical insights. The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." *Id.*, at 241 (emphasis added).

Here, by contrast, the trial court *did* bar the proffered defense testimony. It did not, as in *Nobles*, simply condition the right to introduce the testimony on the defendant's disclosure of evidence that might demonstrate weaknesses in the testimony. The authority of trial courts to prevent the presentation of a "half-truth" by ordering further discovery is thus not at issue here. For similar reasons, the holding in *Brown* (that a person who testifies at her own denaturalization proceeding waives her Fifth Amendment right not to answer questions on cross-examination) can have no bearing on this case.

Nor, despite the Court's suggestions, see *ante*, at 414–417, is the preclusion at issue here justifiable on the theory that a trial court can exclude testimony that it presumes or finds suspect. In the first place, the trial court did not purport to rely on any such presumption or finding in this case. Rather, *after* ruling that he would exclude the testimony because of the discovery violation, the judge stated:

"Further, *for whatever value it is, because this is a jury trial*, I have a great deal of doubt in my mind as to the veracity of this young man that testified as to whether he was an eyewitness on the scene, sees guns that are wrapped up. He doesn't know Ray but he stops Ray.

*"At any rate*, Mr. Wormley is not going to testify, be a witness in this courtroom." App. 28 (emphasis added).

The judge gave no indication that he was willing to exclude the testimony based solely on its presumptive or apparent lack of credibility. Nor, apparently, would Illinois law allow him to do so. See generally, *e. g.*, *People* v. *Van Dyke*, 414 Ill. 251, 254, 111 N. E. 2d 165, 167 ("The credibility of the witnesses presented, as well as the weight of the evidence, [is] for the jury to determine and the court will not substitute its judgment therefor"), cert. denied, 345 U. S. 978 (1953); *Village of DesPlaines* v. *Winkelman*, 270 Ill. 149, 159, 110 N. E. 417, 422 (1915) ("[I]t is . . . for the jury to determine . . . to which witnesses they will give the greatest weight, and not for the court to tell them"). Indeed, far from being able to prevent the jury from hearing the testimony of witnesses that the trial court deems untrustworthy, Illinois trial courts are not even permitted to *comment* on the credibility of witnesses to the jury.[3] No Illinois case interpreting Rule 415(g) suggests that the Rule gives a trial judge special authority to exclude criminal defense witnesses based on their apparent or presumed unreliability.

In addition, preventing a jury from hearing the proffered testimony based on its presumptive or apparent lack of credibility would be antithetical to the principles laid down in *Washington* v. *Texas*, 388 U. S., at 20–23, and reaffirmed in *Rock* v. *Arkansas*, 483 U. S., at 53–55. We there criticized rules that disqualified witnesses who had an interest in the

---

[3] See, *e. g.*, *People* v. *Santucci*, 24 Ill. 2d 93, 98, 180 N. E. 2d 491, 493 (1962) ("Ultimate decisions of fact must fairly be left to the jury, as must be the determination of the credibility of witnesses and the weight to be afforded their testimony, and to this end it is not the province of the judge, in a criminal case, to convey his opinions on such matters to the jurors by word or deed"); *People* v. *Heidorn*, 114 Ill. App. 3d 933, 936, 449 N. E. 2d 568, 572 (1983) ("While the trial judge has wide discretion in the conduct of trial, he must not make comments or insinuations, by word or conduct, indicative of an opinion on the credibility of a witness . . .").

litigation as having the "effect of suppressing the truth," *Washington* v. *Texas, supra,* at 20, noting that:

> "[D]isqualifications for interest . . . rested on the unstated premises that the right to present witnesses was subordinate to the court's interest in preventing perjury, and that erroneous decisions were best avoided by preventing the jury from hearing any testimony that might be perjured, even if it were the only testimony available on a crucial issue.
>
> "'. . . [T]he conviction of our time is that the truth is more likely to be arrived at by hearing the testimony of all persons of competent understanding who may seem to have knowledge of the facts involved in a case, leaving the credit and weight of such testimony to be determined by the jury or by the court.' . . .
>
> "'. . . [W]e believe that [the latter] reasoning [is] required by the Sixth Amendment." 388 U. S., at 21–22, quoting *Rosen* v. *United States,* 245 U. S. 467, 471 (1918).

See also *Rock* v. *Arkansas, supra,* at 53–55 (quoting and restating the above). The Court in *Washington* v. *Texas* accordingly concluded that "arbitrary rules that prevent whole categories of defense witnesses from testifying on the basis of *a priori* categories that presume them unworthy of belief" are unconstitutional. 388 U. S., at 22.

Although persons who are not identified as defense witnesses until trial may not be as trustworthy as other categories of persons, surely any presumption that they are so suspect that the jury can be prevented from even listening to their testimony is at least as arbitrary as presumptions excluding an accomplice's testimony, *Washington* v. *Texas, supra,* hearsay statements bearing indicia of reliability, *Chambers* v. *Mississippi,* 410 U. S. 284 (1973), or a defendant's posthypnosis testimony, *Rock, supra*—all of which have been declared unconstitutional. Compare *ante,* at 414–417.

The proper method, under Illinois law[4] and *Washington* v. *Texas, supra,* for addressing the concern about reliability is for the prosecutor to inform the jury about the circumstances casting doubt on the testimony, thus allowing the jury to determine the credit and weight it wants to attach to such testimony.[5] The power of the court to take that kind of corrective measure is undisputed; the defendant concedes that the court could have allowed the prosecutor to comment on the defense's failure to disclose the identity of the witness until trial. See Brief for Petitioner 18–19.

Leaving deterrence aside for the moment, then, precluding witness testimony is clearly arbitrary and disproportionate to the purpose discovery is intended to serve—advancing the quest for truth. Alternative sanctions—namely, granting the prosecution a continuance and allowing the prosecutor to comment on the witness concealment—can correct for any adverse impact the discovery violation would have on the truthseeking process. Moreover, the alternative sanctions, unlike the preclusion sanction, do not distort the truthseeking process by excluding material evidence of innocence.

### (2)

Of course, discovery sanctions must include more than corrective measures. They must also include punitive measures that can deter future discovery violations from taking place. Otherwise, parties will have little reason not to seek

---

[4] Cf. *People* v. *Rayford,* 43 Ill. App. 3d 283, 288, 356 N. E. 2d 1274, 1278 (1976). The reasons cited by Illinois courts for forbidding judicial comment do not apply with the same force to prosecutorial comment. See, e. g., *Santucci, supra,* at 98, 180 N. E. 2d, at 493; *Heidorn, supra,* at 937, 449 N. E. 2d, at 572.

[5] Precluding a witness based solely on a judge's belief that the witness lacks credibility might also implicate the constitutional right to a jury trial in that it usurps the jury's central function of assessing the credibility of witnesses. The constitutional right to a jury trial would mean little if a judge could exclude any defense witness whose testimony he or she did not credit.

tactical advantages by purposefully violating discovery rules and orders. Those violations that are not caught and corrected will then impose a significant cost on the truthseeking process, see *supra*, at 425; *ante*, at 411–412, that, in the long run, could conceivably outweigh the burden on truthseeking imposed by the preclusion sanction. Without some means of deterring discovery violations, moreover, the criminal system would continually be interrupted and distracted by continuances and other corrective measures. See *ante*, at 411.

In light of the availability of direct punitive measures, however, there is no good reason, at least absent evidence of the defendant's complicity, to countenance the arbitrary and disproportionate punishment imposed by the preclusion sanction. The central point to keep in mind is that witness preclusion operates as an effective deterrent only to the extent that it has a possible effect on the outcome of the trial. Indeed, it employs in part the possibility that a distorted record will cause a jury to convict a defendant of a crime he did not commit. · Witness preclusion thus punishes discovery violations in a way that is both disproportionate—it might result in a defendant charged with a capital offense being convicted and receiving a death sentence he would not have received but for the discovery violation—and arbitrary—it might, in another case involving an identical discovery violation, result in a defendant suffering no change in verdict or, if charged with a lesser offense, being convicted and receiving a light or suspended sentence. In contrast, direct punitive measures (such as contempt sanctions or, if the attorney is responsible, disciplinary proceedings) can gradate the punishment to correspond to the severity of the discovery violation.

The arbitrary and disproportionate nature of the preclusion sanction is highlighted where the penalty falls on the defendant even though he bore no responsibility for the discovery violation. In this case, although there was ample evidence that the defense attorney willfully violated Rule

413(d),[6] there was no evidence that the defendant played any role in that violation. Nor did the trial court make any effort to determine whether the defendant bore any responsibility for the discovery violation. Indeed, reading the record leaves the distinct impression that the main reason the trial court excluded Wormley's testimony was the belief that the defense counsel had purposefully lied about when he had located Wormley. App. 25–28.

Worse yet, the trial court made clear that it was excluding Wormley's testimony not only in response to the defense counsel's actions in this case but also in response to the actions of other defense attorneys in other cases. The trial court stated:

"... All right, I am going to deny Wormley an opportunity to testify here. He is not going to testify. I find this a blatent *[sic]* violation of the discovery rules, willful violation of the rules. I also feel that defense attorneys have been violating discovery in this courtroom in the last three or four cases blatently *[sic]* and I am going to put a stop to it and this is one way to do so." *Id.*, at 28.

Although the Court recognizes this problem, it offers no response other than the cryptic statement that "[u]nrelated discovery violations . . . would not . . . normally provide a proper basis for curtailing the defendant's constitutional right to present a complete defense." *Ante,* at 416, n. 22. We are left to wonder either why this case is abnormal or why an exclusion founded on an improper basis should be upheld.

---

[6] On the second day of trial, Tuesday, March 27, 1984, defense counsel moved to amend his "Answer to Discovery" to include Alfred Wormley as a defense witness, stating that the defendant had told him about Wormley earlier but that he had not been able to locate Wormley previously. App. 12–13. The next day Wormley testified that defense counsel had visited him at his home and served him with a subpoena on Wednesday, March 21, 1984, five days before the trial began. *Id.*, at 22.

In the absence of any evidence that a defendant played any part in an attorney's willful discovery violation, directly sanctioning the attorney is not only fairer but *more* effective in deterring violations than excluding defense evidence. Compare *ante*, at 413–414. The threat of disciplinary proceedings, fines, or imprisonment will likely influence attorney behavior to a far greater extent than the rather indirect penalty threatened by evidentiary exclusion. Such sanctions were available here. Rather than punishing the defendant under Rule 415(g)(i), the trial court could have sanctioned the attorney under Rule 415(g)(ii), which provides that "Wilful violation by counsel of an applicable discovery rule . . . may subject counsel to appropriate sanctions by the court." See also App. 28 (threatening disciplinary proceedings). Direct sanctions against the attorney would have been particularly appropriate here since the discovery rule violated in this case places the obligation to comply with discovery not on the defendant, but directly on the attorney: providing that, upon motion by the State, a *"defense counsel* . . . shall furnish the State with . . . the names and last known addresses of persons he intends to call as witnesses . . . ." Ill. Sup. Ct. Rule 413(d) (emphasis added).

The situation might be different if the defendant willfully caused the discovery violation because, as the Court points out, see *ante*, at 413–414, some defendants who face the prospect of a lengthy imprisonment are arguably impossible to deter with direct punitive sanctions such as contempt. But that is no explanation for allowing defense witness preclusion where there is no evidence that the defendant bore any responsibility for the discovery violation. At a minimum, we would be obligated to remand for further factfinding to establish the defendant's responsibility. Deities may be able to visit the sins of the father on the son, but I cannot agree that courts should be permitted to visit the sins of the lawyer on the innocent client.

Nor is the issue resolved by analogizing to tactical errors an attorney might make such as failing to put witnesses on the stand that would have aided the defense. Compare *ante*, at 410, 417–418. Although we have sometimes held a defendant bound by tactical errors his attorney makes that fall short of ineffective assistance of counsel, we have not previously suggested that a client can be punished for an attorney's *misconduct*. There are fundamental differences between attorney misconduct and tactical errors. Tactical errors are products of a legitimate choice among tactical options. Such tactical decisions must be made within the adversary system, and the system requires attorneys to make them, operating under the presumption that the attorney will choose the course most likely to benefit the defendant. Although some of these decisions may later appear erroneous, penalizing attorneys for such miscalculations is generally an exercise in futility because the error is usually visible only in hindsight—at the time the tactical decision was made there was no obvious "incorrect" choice, and no prohibited one. In other words, the adversary system often cannot effectively deter attorney's tactical errors and does not want to deter tactical decisions. Thus, where a defense attorney makes a routine tactical decision not to introduce evidence at the proper time and the defense seeks to introduce the evidence later, deterrence measures may not be capable of preventing the untimely introduction of evidence from systemically disrupting trials, jury deliberations, or final verdicts. In those circumstances, treating the failure to introduce evidence at the proper time as a procedural default that binds the defendant is arguably the only means of systemically preventing such disruption—not because binding the defendant deters tactical errors any better than direct punitive sanctions but because binding the defendant to defense counsel's procedural default, by definition, eliminates the disruption. The actual operation of the adversary system generally bears out the analysis outlined above. Direct punitive sanctions are

not available to punish and deter routine tactical errors. If, however, the erroneous nature of the attorney's decision was sufficiently evident at the time, then the system does want to deter the attorney's behavior, and can and does do so by directly sanctioning the attorney for malpractice. It does not bind the defendant, who by establishing malpractice would have also established ineffective assistance of counsel.

The rationales for binding defendants to attorneys' routine tactical errors do not apply to attorney misconduct. An attorney is never faced with a legitimate choice that includes misconduct as an option. Although it may be that "[t]he adversary process could not function effectively if every tactical decision required client approval," *ante*, at 418, that concern is irrelevant here because a client has no authority to approve misconduct. Further, misconduct is not visible only with hindsight, as are many tactical errors. Consequently, misconduct is amenable to direct punitive sanctions against attorneys as a deterrent that can prevent attorneys from systemically engaging in misconduct that would disrupt the trial process. There is no need to take steps that will inflict the punishment on the defendant. Direct punitive sanctions are also more appropriate since the determination that misconduct occurred (and the level of penalty imposed) primarily turns on an assessment of the attorney's culpability rather than, as with procedural defaults, an assessment of the potential for disrupting the trial system. In this case there is no doubt that willfully concealing the identity of witnesses one intends to call at trial is attorney misconduct, that the government seeks to deter such behavior in all instances, and that the attorney knows such behavior is misconduct and not a legitimate tactical decision at the time it occurs. Direct punitive sanctions against the attorney are available. See Rule 415(g)(ii). And the decision to impose the evidentiary exclusion penalty in this case clearly turned on an assessment of the attorney's culpability. See App. 25–28; *People* v. *Rayford*, 43 Ill. App. 3d 283, 286, 356 N. E. 2d 1274, 1277

(1976) (exclusion only justifiable if the discovery violation is deliberate). No one contends that the same exclusion would have been justified if the failure to disclose Wormley's identity had been inadvertent.[7]

## C

In short, I can think of no scenario that does not involve a defendant's willful violation of a discovery rule where alternative sanctions would not fully vindicate the purposes of discovery without distorting the truthseeking process by excluding evidence of innocence. Courts can couple corrective measures that will subject the testimony at issue to discovery and adverse credibility inferences with direct punitive measures that are both proportional to the discovery violation and directed at the actor responsible for it. Accordingly, absent evidence that the defendant was responsible for the discovery violation, the exclusion of criminal defense evidence is arbitrary and disproportionate to the purposes of discovery and criminal justice and should be *per se* unconstitutional. I thus cannot agree with the Court's case-by-case balancing approach or with its conclusion in this case that the exclusion was constitutional.

The Court's balancing approach, moreover, has the unfortunate effect of creating a conflict of interest in every case involving a willful discovery violation because the defense counsel is placed in a position where the best argument he can make on behalf of his client is: "Don't preclude the defense witness—punish me personally." In this very case, for example, the defense attorney became noticeably timid once the judge threatened to report his actions to the disciplinary

---

[7] The witness preclusion sanction thus cannot be justified on the theory that the defendant waived his right to introduce Wormley by failing to name him prior to trial. Indeed, far from being a procedural default, the exclusion of evidence is an unusual sanction applied only in drastic cases, *People* v. *Rayford*, 43 Ill. App. 3d, at 286–287, 356 N. E. 2d, at 1277, and the decision whether to apply it lies in the discretion of the trial court, 141 Ill. App. 3d 839, 844–845, 491 N. E. 2d 3, 7 (1986) (case below).

commission. App. 28–29. He did not argue: "Sure, bring me before the disciplinary commission; that's a much more appropriate sanction than excluding a witness who might get my client acquitted." I cannot see how we can expect defense counsel in this or any other case to act as vigorous advocates for the interests of their clients when those interests are adverse to their own.[8]

It seems particularly ironic that the Court should approve the exclusion of evidence in this case at a time when several of its Members have expressed serious misgivings about the evidentiary costs of exclusionary rules in other contexts. Surely the deterrence of constitutional violations cannot be less important than the deterrence of discovery violations. Nor can it be said that the evidentiary costs are more significant when they are imposed on the prosecution. For that would turn on its head what Justice Harlan termed the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship,* 397 U. S., at 372 (concurring opinion).

Discovery rules are important, but only as a means for helping the criminal system convict the guilty and acquit the innocent. Precluding defense witness testimony as a sanction for a defense counsel's willful discovery violation not only directly subverts criminal justice by basing convictions on a partial presentation of the facts, *United States* v. *Nixon,* 418 U. S., at 709, but is also arbitrary and disproportionate to any of the purposes served by discovery rules or discovery sanctions. The Court today thus sacrifices the paramount values of the criminal system in a misguided and unnecessary effort to preserve the sanctity of discovery. We may never

---

[8] I also note that a case-by-case balancing approach will create uncertainty, spawn unnecessary litigation, and make it difficult to supervise the lower courts. Moreover, any exclusion of criminal defense evidence also has the important disadvantage of inviting an ineffective-assistance-of-counsel claim in every case in which it is applied. Direct sanctions against the attorney would yield no such opportunity to disrupt final verdicts.

know for certain whether the defendant or Bridges' brother fired the shot for which the defendant was convicted. We do know, however, that the jury that convicted the defendant was not permitted to hear evidence that would have both placed a gun in Bridges' brother's hands and contradicted the testimony of Bridges and his brother that they possessed no weapons that evening—and that, because of the defense counsel's 5-day delay in identifying a witness, an innocent man may be serving 10 years in prison. I dissent.

JUSTICE BLACKMUN, dissenting.

I join JUSTICE BRENNAN's dissenting opinion on the understanding—at least on my part—that it is confined in its reach to general reciprocal-discovery rules. I do not wish to have the opinion express for me any position as to permissible sanctions for noncompliance with rules designed for specific kinds of evidence as, for example, a notice-of-alibi rule. In a case such as that, the State's legitimate interests might well occasion a result different from what should obtain in the factual context of the present case.