IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 5, 2008 Session

## STATE OF TENNESSEE v. JUNIOR ALDRIDGE

**Appeal from the Criminal Court for Shelby County**
**No. 05-08430    Chris Craft, Judge**

---

**No. W2007-01722-CCA-R3-CD   -   Filed June 5, 2009**

---

A Shelby County jury found the defendant, Junior Aldridge, guilty of one count each of first degree murder, second degree murder, and especially aggravated robbery. The trial court merged the two murder counts and imposed concurrent sentences of life in prison for the first degree murder conviction and forty years as a Range II, multiple offender for the especially aggravated robbery conviction. On appeal, the defendant argues that the trial court's exclusion of testimony regarding statements made by the victim denied the defendant his right to present a defense. After reviewing the record, we conclude that the trial court properly excluded the testimony and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

James E. Thomas (at trial and on appeal) and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Junior Aldridge.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; William L. Gibbons, District Attorney General; and Michelle Parks and James R. Carter, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

Although the defendant is not challenging the sufficiency of the convicting evidence on appeal, we will provide the following factual summary to establish context for the defendant's issue on appeal. At trial, Jeremy Hull testified that on March 10, 2005, he drove his uncle, Travis Clariett, the victim in this case, from Clariett's mother's home in Burton, Mississippi, to Memphis in an attempt to retrieve the victim's car. Hull said that once he arrived at the Mississippi residence, the

victim's girlfriend, Renarda Irving, arrived in her car, and Hull and the victim followed Irving to Memphis. Hull lost sight of Irving but the victim led Hull to Irving's house. The two men left Irving's house, went to a fast food restaurant down the street, then returned to the house. Soon after the two men returned to Irving's house, Irving arrived. Hull said that she asked the victim to come into the house, but the victim refused.

Five to ten minutes later, an "older guy," whom Hull identified as the defendant at trial, pulled up in the victim's car, parking the car behind Hull's car. Hull said that the defendant went into the house two or three times; Irving initially stood on the front porch, but eventually she and the victim got into the victim's car, with the victim sitting in the driver's seat and Irving sitting in the front passenger seat. Hull said that the second or third time the defendant exited the house, he carried a plastic bag in his hand. Hull said that in his rearview mirror he saw the defendant walk to the rear passenger side window, take a gun out of the bag, shoot the victim, and run away. Hull said that after he saw defendant shoot the victim, he drove off because he "didn't know where the next shot was going." Hull later identified the defendant's photograph in an array prepared by the Memphis Police Department.

On cross-examination, Hull said that Irving was the victim's girlfriend, not his wife. Hull said he knew the victim fairly well and knew that the victim and Irving had been dating for some time, but he never spoke with the victim about the relationship and had never met Irving before the day of the shooting. He testified that when Irving arrived at the residence in Mississippi, she put some of the victim's clothes in the back seat of Hull's car before driving away. According to Hull, Irving said nothing to the victim at this time. Hull said that he was unaware why Irving had the victim's car at the time, but he did not believe that Irving had taken the car from him.

Hull testified that once they arrived at Irving's home and discovered that she was not there, they went to a fast food restaurant, where they spent twenty-five to thirty minutes before returning to Irving's residence, where she was waiting. Hull said that the victim did not appear nervous before being shot. He said that Irving "holler[ed]" at the victim two or three times in an attempt to get him to go inside her house, but he refused. Hull said that while Irving was not calm, the extent of her and the victim's argument involved the victim saying "no" to Irving's entreaties.

Hull admitted that on the day of the shooting he told police that while he was aware that the shot came from the passenger side of the victim's car, he did not know whether the shot came from the front or rear window. He also admitted that he told police that he put his car in drive before the victim was shot. However, he insisted that despite this statement to police, the defendant shot the victim from the rear passenger window and that he (Hull) drove away after the victim was shot.

On redirect examination, Hull said that the victim had around $2500 in his possession before the shooting. He said that he saw Irving after the defendant shot the victim, and that Irving was "hollering and crying" after the incident. Hull said that he did not see Irving with a weapon during the incident.

Irving testified that on March 10, 2005, she met with the victim to return his car to him. Irving, who said that she had keys to the victim's car, testified that she and the victim also planned

2

for the victim to give her "tax money" that day. Irving explained that the victim claimed her daughter as a dependent on his income tax returns even though she and the victim were not married and he was not the girl's father. Irving said that the victim would receive a larger income tax refund under this arrangement than she would receive were she to claim her daughter; the victim and Irving agreed that he would give this money, totaling $2500, to her.

Irving said that she went to the victim's mother's house in Mississippi and led the victim and his nephew, Hull, to her house, which she shared with another woman, Lisa Mays. Unlike Hull, Irving testified that she and Hull arrived at the house at the same time. Irving said that the defendant, whom she came to know after the defendant worked on her car, was present when she, the victim, and Hull arrived at the house. She and the defendant went to retrieve the victim's car; once they arrived at the house where the car was located, Irving and the defendant returned to her house separately, with Irving driving her car and the defendant arriving in the victim's car fifteen to twenty minutes later. Irving said that the defendant parked the car in front of the house, behind Hull's car.

Irving said that once the defendant arrived in the victim's car, the defendant left the car, leaving the keys in the ignition. The victim and Irving then got into the victim's car, with the victim sitting in the driver's seat and Irving sitting in the front passenger seat. At that time, the victim removed money from his pocket and began counting it. The victim counted $500 and gave it to her. Irving said that while the victim was counting money, the defendant came to the car. The victim told the defendant to go to the house and get his shoes. The defendant exited the house the first time without the shoes, at which time the victim told the defendant to return to the house and ask Lisa Mays, Irving's roommate, where the shoes were. The defendant returned to the house and emerged a second time, carrying a plastic bag. The defendant asked the victim to lower the rear passenger side window, which the victim did. At that point, the defendant hit Irving in the head with a gun and demanded that she and the victim give him their money. Irving then gave the defendant some money before hearing a shot. She then saw the victim fall halfway out of the car and the defendant run away. Hull drove away after the shot was fired, but he later returned. Irving testified that at the time the victim was shot, he was facing her, with his back to the driver's side window. She said that from this position, the victim could see the defendant.

On cross-examination, Irving said that while she referred to the victim as her husband, she and the victim were not legally married. Irving said that at one point she and the victim participated in what she believed was a wedding ceremony; she said that only she, the victim, a man who was working at the house that day, and Melvin Smith, the man whom Irving believed presided over the ceremony, attended. Irving believed she was married to the victim after the ceremony; however, she later learned that the wedding ceremony was not valid.

Irving said she was unaware that the victim's claiming her daughter on his income tax return constituted fraud. Regarding the victim's car, Irving denied taking the car without his permission and using it as "collateral" or "leverage" which would force the victim to pay the money he owed her from his tax return. She also denied hiding the car from the victim. Rather, she said that a few days before the shooting, the victim told her to take the car from the victim's workplace and bring it to a friend's house to be repaired. Irving said that she was unaware that the victim had the tax refund money until he called her the morning of the shooting.

Irving said that by the day of the shooting, the victim had moved out of the house which they and Mays had shared. However, she insisted that their relationship was a "good" one and would have continued had the victim not been killed. Irving denied hitting the victim or calling him names. Irving also denied yelling at the victim or trying to convince him to come inside the house before the shooting. Irving said that during the fifteen minutes between her arrival at her house the second time and the defendant's arrival with the victim's car, she and the victim had a calm conversation, with her standing outside Hull's car and the victim seated inside Hull's car. Irving claimed that the victim did not appear to be scared of her during this conversation.

Irving said that she had not expected to see the defendant the day of the shooting, but she was not scared when she first saw him or when she asked him to help her retrieve the victim's car. Irving said she did not tell the defendant about the money the victim was planning to give her. She said that she did not see where the victim was shot.

Anthony Franklin testified that on the afternoon of March 10, 2005, he was returning home from his job as a security guard. While at a stop sign near the intersection of Carnes Avenue and Greer Street, he saw "a male black approach[] [a] vehicle from the passenger side and fire[] shots into the vehicle." Franklin then saw the shooter run away. Franklin further described the shooter as being "[a]bout six feet in height, slim build, wearing dark clothing and a black leather jacket." He said that the defendant looked like the shooter but that he was unsure that the defendant actually committed the offense. Franklin added that the shooter, who was carrying an object in a plastic bag, "approached the vehicle from the rear" before firing into the rear passenger side window. Franklin said that the house in front of which the incident occurred was two houses from the intersection at which he stopped; while Franklin initially saw the shooter approach the car while he was at the intersection, he drove past the victim's car when the shooting occurred. Franklin said that he did not know whether anyone was sitting in the front passenger seat when the shooting occurred, and he did not hear any screaming coming from the car before the shots were fired. On cross-examination, Franklin admitted that he did not see the shooter actually fire into the car, but that he instead only heard gunshots.

Officer Lavern Jones with the Memphis Police Department testified that he was the crime scene investigator assigned to this case. Officer Jones testified that he found a purse and some money on the front passenger side floorboard of the victim's car. He said that he found approximately $750 inside the car, some of which was in the purse and some of which was on the floorboard. The officer also recovered a .40 caliber shell casing from atop a jacket on the front passenger seat. He said that his service weapon was a .40 caliber semi-automatic pistol, and in his experience the gun ejected its spent shell casings to the right. On cross-examination, Officer Jones said that he did not see any bullet strikes inside the car, nor did he see any money outside the car.

Dr. Kenneth Snell, who at the time of the shooting was the chief medical examiner for Shelby County, testified that he performed the autopsy in this case. Dr. Snell testified that the victim died of a single gunshot wound to the chest. The bullet, which Dr. Snell described as a "large caliber" projectile, entered the victim's right upper chest and traveled "from the decedent's right to left, front to back . . . [with] a downward movement as well." Although Dr. Snell characterized the bullet's path as a "downward movement," on cross-examination he admitted that the bullet exited the

4

victim's body on a level only a half inch below the level on which the bullet entered the body. Dr. Snell said that the victim's injuries could have been caused by someone shooting from the vehicle's rear passenger window if the victim had been turned facing the window, although on cross-examination Dr. Snell testified that the shot could also have been fired by someone sitting in the front passenger seat. Dr. Snell said that weapons fired at close range usually resulted in soot being left on the body, but no soot was found on the victim's body or clothes. However, Dr. Snell said that he did not use a microscope to search for stipling on the victim's clothes or body. Dr. Snell said that semi-automatic weapons generally eject their spent shells to the right, but he noted that he was not a ballistics expert and could not say with certainty from where the fatal shot was fired.

Reverend Melvin C. Smith, testifying for the defendant, said that he did not perform wedding ceremonies outside his church. He said that he did not know the victim or Irving and did not preside over any ceremony involving them. Dr. O.C. Smith, the former chief medical examiner for Shelby County, testified that because "in the whole width of the body the bullet descended only half an inch," one would be unable to determine the angle at which the fatal shot was fired. Dr. Smith said that while someone sitting in the front passenger seat could have fired the fatal shot, the shot could also have come from the rear passenger window.

Jacoby Burks testified that he knew the victim for about five years before his death. Brooks said that he saw at least one, but fewer than five, arguments between the victim and Irving, whom he knew were dating, and that Irving punched the victim during some of these arguments. On cross-examination, Burks said that only one of the arguments between the victim and Irving devolved into a physical confrontation and that this confrontation ended rather quickly. Burks admitted that "[m]ost of the time" when he saw the victim and Irving, they were not fighting.

The jury found the defendant guilty of one count of first degree felony murder and one count of especially aggravated robbery as charged in the indictment. The indictment also charged the defendant with one count of premeditated first degree murder. The jury acquitted the defendant on this count but found him guilty of the lesser included offense of second degree murder, which the trial court merged with the defendant's first degree murder conviction. The defendant subsequently filed a timely notice of appeal.

## ANALYSIS

The defendant's sole issue on appeal is that the trial court's exclusion of certain evidence denied him the right to present a defense. After reviewing the record, we conclude that the trial court properly excluded the evidence at issue.

*Preliminary Hearing*

On the day the trial began, the State made an oral motion to exclude all references to the marital status of the victim and to exclude statements made by the victim to a Collierville police officer two days before the victim was killed. Regarding the victim's marital status, in a jury-out hearing the defendant argued that Irving's telling "multiple individuals that she and [the victim] were

married" when in fact they were never married impacted "her honesty, her ability to tell the truth." The trial court agreed with the defendant, ruling that the jury "ought to be allowed to go into her statements about their relationship, especially if the[] defense is going to be that she's the one [who] did the killing." On cross-examination, defense counsel asked Irving numerous questions about her relationship with the victim. After Irving testified that she and the victim had participated in what she believed to be a marriage ceremony, defense counsel attempted to show Irving a purported marriage license.[1] The State objected, and during a bench conference the trial court instructed defense counsel that he could only introduce the document if Irving denied telling people that she and the victim were married. Defense counsel then asked Irving if she told people that she and the victim were married. Irving admitted that she did, and that such a statement was a lie. Defense counsel continued to ask Irving questions about her relationship with the victim, but the defendant did not attempt to introduce the purported license after his initial attempt.

Regarding the victim's statements to police, at the jury-out hearing the defendant noted that two days before the victim died, the victim filed a stolen car report with the Collierville Police Department. The defendant further noted that "in the statement [the victim] indicate[d] to the Collierville Police Officer that he was in fear of his girlfriend at that time. We think that it is relevant to show that there's an existing mental state. That he was afraid of [Irving]." The defendant also announced his intention to introduce a written statement the victim gave to the police in connection with the report. The trial court read this statement into the record:

> At approximately 8:30 p.m., I walked outside for break, that's when I saw my white Cadillac Sedan Deville, missing. I have reason to believe that Renarda Irving stole my car, because she had been threatening me and she had opportunity, Monday. She came to my job and threaten[ed] to do something bad to me.

The State argued that the victim's written and oral statements to police were inadmissible hearsay, while the defendant argued that the statement was "relevant to show that someone other than [the defendant] killed [the victim]." At the close of the hearing, the trial court said that it would withhold its ruling on the admissibility of the victim's statements until after Irving testified; specifically, the trial court noted that "I would allow her to be cross-examined by the defense on whether there were any threats and if she denies the threats, then I think . . . we need to let the defense put that statement in, through a police officer." However, after a recess, the trial court ruled that the statements would be inadmissible. The trial court stated that the statements would not be admissible under the "state of mind" hearsay exception because "only the declarant's conduct, the victim's conduct, not some third party's conduct, is probable by this hearsay exception." Regarding the defendant's argument that the statements were admissible pursuant to his constitutional right to present a defense, the trial court noted:

> [The defendant's statement] is reliable only in the sense that apparently the defense could establish that it was given to a police officer, but there's no reliability about,

---

[1]This document was not made an exhibit for identification purposes at trial, nor does it appear in the record on appeal.

6

from the victim's motive, of why he might have made that statement. . . . I'm meaning no disrespect to the victim, or the defendant, or any of the witnesses, but we have people filing false stolen car reports in Memphis all of the time and people pawn cars for crack, or they loan people cars and they don't bring them back and they call the police in a peak of anger. Apparently . . . the witness and the victim shared some relationship - - I am not sure what that relationship is. . . .

But, we don't really know why he gave that statement to the police, about why she may have taken his car, or . . . what she threatened to do.

So for that reason I find that it's not so crucial to the defense and so reliable that it would overcome the strong interest that we have in our justice system of excluding such speculative hearsay evidence.

### *Offer of Proof*

During a jury-out offer of proof, Officer Neil Young with the Collierville Police Department testified that on March 8, 2005, he responded to an automobile burglary call at the Carrier plant where the victim was employed. The victim, whom Officer Young described as "rather upset" but who appeared "to be acting in good faith," told the officer that Irving had stolen his car from the Carrier parking lot. Officer Young said that the victim "appeared more upset, [rather] than scared" of Irving, but in a written statement, presented above, the victim said that Irving had threatened him. After the defendant's offer of proof, the trial court reaffirmed its order excluding the victim's statements to police, with the trial court's reasoning mirroring that outlined in the court's pretrial decision.

### *Due Process and the Right to Present a Defense*

"The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000); see Taylor v. Illinois, 484 U.S. 400, 408, 108 S. Ct. 646, 652 (1988); Washington v. Texas, 388 U.S. 14, 23, 87 S. Ct. 1920, 1925 (1976). However, this right is not absolute: "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence. . . ." Chambers v. Mississippi, 410 U.S.284, 302, 93 S. Ct. 1038, 1049 (1973). "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Brown, 29 S.W.3d at 432 (citations omitted). In determining whether a trial court's evidentiary ruling violates the defendant's constitutionally-protected right to present a defense, an appellate court must consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting the exclusion of the evidence is substantially important. Id. at 433-34.

In this case, the purported marriage certificate the defendant sought to introduce during Irving's cross-examination was not critical to his defense. Our supreme court has suggested that for

7

evidence to be considered critical to the defense, the evidence must have some probative value and "exclusion of the evidence would undermine an element of a particular defense." See State v. Flood, 219 S.W.3d 307, 316-17 (Tenn. 2007). The defendant sought to attack the credibility of Irving, the State's key witness to the defendant's killing, and it did so by cross-examining her. During her cross-examination, Irving admitted that she and the defendant were not married and that her telling others that they were married constituted lying on her part. The defendant was able to further attack Irving's credibility through the testimony of Pastor Smith, the purported officiant at the alleged wedding ceremony, who said that he never officiated at any ceremony between the victim and Irving. Furthermore, as the purported marriage license is not in the record on appeal, we cannot ascertain whether the document bears any indicia of reliability. Therefore, we conclude that the trial court's exclusion of the purported marriage license did not deny the defendant his right to present a defense.

Regarding the evidence concerning the victim's statements to police, on appeal the defendant argues that the excluded evidence helped establish that Irving, and not the defendant, killed the victim, and that Irving had threatened the victim shortly before his death. However, the defendant was able to introduce other evidence to advance these theories. The defendant extensively cross-examined Irving about her relationship with the victim and her motive for being with the victim the day of the shooting, and the defendant presented testimony from a witness, Jacoby Burks, who said that Irving had fought with the victim on occasion. The defendant also elicited testimony from his expert witness, Dr. Smith, and the State's expert witness, Dr. Snell, that someone seated in the front passenger seat—where Irving insisted she was sitting at the time of the shooting—could have fired the fatal shot. Therefore, while the victim's purported statement, but for the reliability issues explained below, was probative of the defendant's argument that Irving shot the victim, the cumulative nature of the evidence was such that its exclusion did not undermine an element of that defense. Because the defendant was able to argue this defense through other means, we agree with the trial court that evidence regarding the victim's statements to police was not critical to the defense.

Similarly, we agree with the trial court that the other two factors outlined in Brown are not met. The victim's statements to police do not bear sufficient indicia of reliability, as the victim was unavailable to testify regarding his motive for making the statements and there is nothing evident from the circumstances surrounding the statement to support the statement's reliability. On the contrary, the relationship between the victim and Irving undermines the reliability of the statement. Furthermore, Officer Young testified that the victim did not appear to be in fear of the defendant at the time he made his statement. That Irving had keys to the victim's car and that the victim agreed to meet with Irving the day of his death—even sitting alone with her in his car before he was shot—further tends to undermine the reliability of his statement that he was afraid of Irving. Regarding the third factor, this court has noted that "[t]he interest in excluding unreliable and inaccurate hearsay testimony" pursuant to the Rules of Evidence "is an important one." State v. Michelle Shoemaker, No. M2005-02652-CCA-R3-CD, 2006 WL 3095446, at *11 (Tenn. Crim. App. Nov. 2, 2006) (citing Neil P. Cohen et al, Tennessee Law of Evidence § 8.01[3][a] (5th ed. 2005)). As stated above, the defendant presented evidence supporting his theories that Irving threatened the victim before killing him and that the victim was afraid of Irving. We therefore conclude that the trial court's exclusion of the victim's statements to the police did not infringe upon the defendant's

8

due process right to present a defense.

_____

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____

D. KELLY THOMAS, JR., JUDGE