*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

MUNJEL SHARROD AYERS,

      Defendant-Appellant.

UNPUBLISHED
June 18, 2020

No. 345989
Genesee Circuit Court
LC No. 17-041035-FH

Before: SWARTZLE, P.J., and GLEICHER and M. J. KELLY, JJ.

PER CURIAM.

Following a bench trial, Munjel Ayers was convicted of two of the three felonies with which he stood charged. Ayers challenges his convictions and sentence on a variety of grounds: the propriety of his jury trial waiver, the sufficiency of the evidence underlying one of the convictions, and the ineffectiveness of his counsel. He also asserts that a sentencing guideline was misscored.

The trial court committed several errors, but none require a new trial. We affirm Ayers's convictions, but remand for resentencing.

I

Ayers and his now ex-wife, Latasha Jones, married in 2002 and together are the parents of four children. Jones and Ayers separated in 2014. Two years later, Jones began dating Tylon Brantley. Brantley moved into Jones's leased townhouse in September 2016.

Ayers was displeased with Jones's new relationship, to put it mildly. His behavior led Jones to seek a personal protection order (PPO). Her petition averred that Ayers had harassed and physically assaulted her, called her names, and threatened her. In November 2016, a court issued a PPO prohibiting Ayers from entering Jones's property, following her, and appearing within her sight. Ayers and Jones agreed that despite the existence of the PPO, Ayers frequently visited Jones's home to spend time with his children.

On the date of the events leading to Ayers' arrest, the PPO remained in effect. That morning, Ayers appeared at Jones's workplace and stared at her through a window. Jones's manager sent her home. Ayers showed up at Jones's residence shortly thereafter and Jones asked him to leave. Instead, Ayers climbed on top of Brantley's car and, according to several witnesses, attempted "to rip off the windshield wipers." Brantley confronted Ayers near the car; a family member separated them. Ayers then returned to Brantley's car and continued vandalizing it. Jones retrieved Brantley's car keys and moved the vehicle down the street.

While Jones was relocating the car, Ayers returned to Jones's residence. Their then 14-year-old son, MA, opened the front door and allowed Ayers to enter the home. Ayers and MA agreed that Ayers had arranged to bring the young man five dollars. MA testified that Jones knew Ayers was coming to hand over the cash, and added that Jones frequently asked Ayers to check in on his children at her home.

When Ayers entered Jones's residence, he spotted Brantley sitting in the dining room. Brantley immediately ran out through the back door because, he later explained, "I knew that he was gonna try to come for me." Ayers began to run after Brantley, but stopped at the back door. Brantley recounted that Ayers "was cursing at me."

Ayers testified on his own behalf. He admitted walking to the threshold of Jones's home and asserted that he had done so with Jones's permission so that he could give MA the money. Ayers denied having chased Brantley. He insisted that Jones informed him that she had "dropped" the PPO.

The prosecutor charged Ayers with first-degree home invasion, MCL 750.110a(2), aggravated stalking, MCL 750.411i, and malicious destruction of property, MCL 750.377a(1)(b)(i). The trial court convicted him of the home invasion and stalking charges, but acquitted him of maliciously destroying property (Brantley's car).

II

Ayer argues that the trial court erred in accepting his waiver of his right to a jury trial. The court failed to comply with the requirements of MCR 6.402(B), Ayers contends, and he did not otherwise knowingly and voluntarily waive his right to be tried by a jury. Ayers did not raise this argument in the trial court. Therefore, his claim is unpreserved and our review is confined to plain error.

Plain error requires a showing that (1) error occurred, (2) the error was "clear or obvious," and (3) the error affected the defendant's substantial rights. *People v Kimble*, 470 Mich 305, 312; 684 NW2d 669 (2004) (cleaned up).[1] The third requirement generally requires a showing that "the error affected the outcome of the lower court proceedings." *Id.* (cleaned up). Reversal is warranted

---

[1] This opinion uses the new parenthetical "cleaned up" to improve readability without altering the substance of the quotation. The parenthetical indicates that nonsubstantive clutter such as brackets, alterations, internal quotation marks, and unimportant citations have been omitted from the quotation. See Metzler, *Cleaning Up Quotations*, 18 J App Pract & Process 143 (2017).

only when the plain error led to "the conviction of an actually innocent defendant" or "seriously affected the fairness, integrity, or public reputation of [the] judicial proceeding." *Id*. (cleaned up).

Although the trial court plainly erred by failing to abide by MCR 6.402(B), the record does not support that Ayers's substantial rights were affected by this omission.

The Sixth Amendment right to a trial by a jury in a criminal case is considered "fundamental to the American scheme of justice." *Duncan v Louisiana*, 391 US 145, 149; 88 S Ct 1444; 20 L Ed 2d 491 (1968). Because the right is fundamental, to satisfy constitutional standards the defendant must personally participate in the waiver process. See *Taylor v Illinois*, 484 US 400, 418 n 24; 108 S Ct 646; 98 L Ed 2d 798 (1988). Counsel may not waive a jury trial on a defendant's behalf. *People v Cook*, 285 Mich App 420, 423; 776 NW2d 164 (2009). A valid waiver must also qualify as voluntary, knowing, and intelligent. *Id*. at 422. A trial court's compliance with MCR 6.402(B) goes a long way toward meeting these requirements by creating a presumption to that effect. *Cook*, 285 Mich App at 422-423.

MCR 6.402(B) provides:

> Before accepting a waiver, the court must advise the defendant in open court of the constitutional right to trial by jury. The court must also ascertain, by addressing the defendant personally, that the defendant understands the right and that the defendant voluntarily chooses to give up that right and to be tried by the court. A verbatim record must be made of the waiver proceeding.

Adherence to the court rule provides the best evidence of a constitutionally sufficient waiver.

The colloquy set forth in the court rule is not a *constitutional* mandate, however, so reversal is not necessarily required when a trial court neglects to engage in it. "If a defendant's waiver was otherwise knowingly, voluntarily, and intelligently made, reversal will not be predicated on a waiver that is invalid under the court rules because courts will disregard errors that do not affect the substantial rights of a defendant." *People v Mosly*, 259 Mich App 90, 96; 672 NW2d 897 (2003) (cleaned up).

The record reflects that the trial court neglected to engage in the necessary waiver colloquy with Ayers. On the first day of trial, the parties discussed a plea offer made by the prosecutor and the possibility of a bench trial. Based on a brief interaction, the court appropriately recognized that Ayers needed to discuss a possible jury trial waiver with his lawyer:

> *The Court*: That's the offer that's on the table for you, Mr. Ayers, and I'm still gonna give you a few minutes to discuss one more time before we call the jury up. And then in turn, my second question to you is regarding the bench trial. I just want to hear from you that you are waiving your right to a jury trial, which we've got that available to you, if you want this Court, that would be me, to hear the evidence and render the decision. That's the question that we put to you this morning by your counsel.
>
> *Defendant*: Because it's new to me, I'm sorry.

*The Court*: Right. No, I know, I understand - -

*Defendant*: Yeah, so - -

*The Court*: - - no one had - - and I, believe me, I did not make that suggestion. The two counsel realized that they had never broached that subject with you and said that they were going to bring it up to you. I - - this is entirely up to you.

*Defendant*: To be honest with you, I really just want to get this thing over with, and just - - think that you'll be fair, actually - -

*The Court*: I promise you I'll be fair.

*Defendant*: - - I think that 'cause I feel like that God is telling me to go ahead and have you, instead of the Court having to pay twelve people for something I believe that we can easily work out a good agreement that both sides would be happy and we can get this over with without the state having to pay twelve people for something I believe that we all can work something out.

*The Court*: Well, there are two separate decisions in terms of a work out.

*Defendant*: Okay.

*The Court*: In terms of who is going to adjudicate your guilt or innocence, that choice is twelve members of Genesee County, your peers - -

*Defendant*: Yes, ma'am.

*The Court*: - - versus the Court. And I'm going to allow you to have some private time with your counsel - -

*Defendant*: Okay.

*The Court*: - - to have one more discussion on that.

*Defendant*: Okay.

The court took a 15-minute recess. When the matter reconvened, the trial court directed Ayers's counsel, rather than Ayers, to ratify that Ayers preferred a bench trial:

*The Court*: We're gonna go back on the record . . . . And Mr. Ayers, you had the opportunity to consult with your counsel one last time, and I would like Mr. Beauvais to place on the record what your decisions are one more time.

*Defense Counsel*: Yes, Your Honor. Again, I talked about the offers that have been made by Mr. McCombs for the People. Mr. Ayers has told me again that he does not want to avail himself of that. He has told me that he wishes to have a

bench trial in this case and have Your Honor hear the evidence and make the rulings.

> *The Court*: Okay. It's within the discretion of this Court to allow that or to, I guess, accept the responsibility of a bench trial and I will do that. I'm going to alert the jury coordinator to release the jury that we had called in and I guess we're ready to proceed.

> *Defense Counsel*: We are, Your Honor. If I could just have - - Mr. Ayers is all that I have just said, is all of that accurate?

> *Defendant*: Yes, that's (inaudible).

> *Defense Counsel*: Okay.

> *The Court*: Okay. Very good. Mr. McCombs, let's have our opening statements.

The next day, Ayers signed a standard jury trial waiver form.

Although the court did not conduct the discussion with Ayers mandated by the court rule, we may not reverse on that ground unless the omission affected Ayers's substantial rights, as Ayers neglected to raise any objection to a bench trial in the lower court. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). If Ayers otherwise knowingly, voluntarily, and intelligently waived his right to a jury trial, the inadequate waiver colloquy did not affect his right to a jury trial.

Ayers does not dispute that on the second day of trial, he signed a form waiver attesting that he "fully" understood "that under the laws of this state I have a constitutional right to a trial by jury." Nevertheless, he contends, no "independent indicia" support that he knowingly and voluntarily signed it, or that he truly understood his rights at that time.

"[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case." *Adams v US ex rel McCann*, 317 US 269, 278; 63 S Ct 236, 241; 87 L Ed 268 (1942). "[T]he dispositive inquiry is whether the defendant understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge." *Jells v Mitchell*, 538 F3d 478, 510 (CA 6, 2008) (cleaned up).

How are we to determine whether Ayers truly understood the rights he waived when he verbally agreed to a bench trial, and when he signed the waiver form? Ayers did not challenge the jury trial waiver in the trial court and has not moved for a remand on the ground that it was involuntary or unknowing, so the record is silent on this subject. Under plain error review, Ayers bears the burden of establishing prejudice, "i.e., that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. Applied here, establishing prejudice means that Ayers must demonstrate that but for the trial court's failure to accomplish a constitutionally satisfactory waiver hearing, a reasonable probability exists that he would not have waived his right to a jury trial.

Ayers has not carried this burden. No evidence of record substantiates that Ayers lacked an informed understanding of his right to a jury trial, or that he likely would have elected a jury trial but for the inadequate waiver process. To the contrary, the colloquy and the signed waiver form substantiate that Ayers did, in fact, knowingly and intelligently waive his right to a jury trial.

Ayers additionally asserts that a new trial is warranted because the denial of his right to a jury trial constitutes structural error. Our Court's jurisprudence holds that a constitutionally invalid waiver of a jury trial is a structural error. *Cook*, 285 Mich App at 427. Ayers has not demonstrated that his waiver was constitutionally infirm and therefore has not established an error, constitutional or otherwise.

III

Ayers next asserts that the trial court's finding that he "broke" into Jones's residence is unsupported by the evidence, requiring the vacation of his home invasion conviction. We agree that the evidence did not support the "breaking" element of first-degree home invasion, as Ayers was allowed into the home by his son, his son opened the door to admit Ayers, and Ayers's effort to hold the door open was not a "breaking." The error is harmless, however, as it is clear beyond a reasonable doubt that the court nevertheless would have found Ayers guilty of home invasion under an alternate theory.

In a bench trial, the trial court must make findings of fact and state separately its conclusions of law. MCR 6.403. A court is not required to make specific findings of fact regarding each element of the crime charged, *People v Legg*, 197 Mich App 131, 134; 494 NW2d 797 (1992), but its findings should reveal how it resolved credibility issues and evidentiary conflicts. *People v Ramsey*, 89 Mich App 468, 477; 280 NW2d 565 (1979). We deem a court's findings sufficient if they reflect the trial court's awareness of the issues in the case and its correct application of the law. *Legg*, 197 Mich App at 134-135.

We review a trial court's findings of fact for clear error and its conclusions of law de novo. MCR 2.613(C). When evaluating a challenge to the sufficiency of the evidence underlying a criminal conviction, we consider the evidence in the light most favorable to the prosecution to determine if the prosecutor established the elements of the offense beyond a reasonable doubt. *People v Henderson*, 306 Mich App 1, 8-9; 854 NW2d 234 (2014), overruled in part on other grounds *People v Reichard*, ___ Mich ___; ___ NW2d ___ (Docket N. 15788) (2020). This approach applies equally to our review of a bench opinion. *Legg*, 197 Mich App at 132; see also *People v Petrella*, 424 Mich 221, 269-270; 380 NW2d 11 (1985). Accordingly, we must affirm the trial court's judgment "if *any* rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *People v Taylor*, 245 Mich App 293, 297; 628 NW2d 55 (2001) (emphasis added). Viewed in the light most favorable to the prosecution, substantial evidence supports the trial court's home invasion verdict despite that the court's legal reasoning was flawed.

The felony information charged Ayers with first-degree home invasion, MCL 750.110a(2), under either of two theories: that Ayers "did break and enter" Jones's home, "or did enter without permission." The prosecutor failed to argue the second theory at the trial, and the court's bench opinion findings focused only on the first. Likely this tunnel vision resulted from MA's testimony

that he was expecting Ayers to arrive that day with the $5.00, and opened the door to let Ayers in. Given this unequivocal and uncontested evidence that Ayers entered through a voluntarily opened door, the prosecutor's "breaking" theory was, at best, problematic. "Breaking" requires the use of "some force." See M Crim JI 25.2a(2). See also *People v Pierce*, 272 Mich App 394, 398; 725 NW2d 691 (2006) ("[B]y its nature, breaking and entering involves the use of physical force, or the substantial risk that physical force may be used, against the property of another in the commission of the offense."). But rather than shifting to the alternate "without permission" ground, the prosecutor dug in, arguing that because Ayers had to hold the screen door open "or it'd have slammed on him," a "breaking" was established. To his credit, the prosecutor admitted in his closing argument: "That's the problem I have with count one. That is the hard element for you to decide in this case. There is no getting around that."

The trial court confined its factual findings to the "breaking" element of first-degree home invasion, neglecting to address the "without permission" strand. The court began by acknowledging that Ayers's defense rested on "the undisputed fact that his 15-year-old-son unlocked and opened the interior door and further opened the exterior screen door so that the defendant could give him the $5.00 he was waiting for." Ayers nonetheless asserted during his testimony that he had not entered the house at all; the trial court found the denial incredible. The court continued:

> When pressed by the prosecution, defendant admitted to contact with the screen door. [MA], the 15-year-old son, stated he was on his way upstairs and agreed that the defendant had to hold the door open himself. The Court finds that although the door was initially opened, it was the defendant's exertion of force to keep the door open that allowed his entry. This amount of force, the holding open of the door that would otherwise have shut, is sufficient force to constitute break-in for the purpose of this element. Accordingly, the Court finds that the prosecution has proved this element beyond a reasonable doubt.

In other words, the trial court ruled, a person "breaks" into a home when invited in, the main door is opened to facilitate entry, and the visitor merely holds on to a screen door, also opened by the host, to facilitate entry.

This conception of "breaking" is logically and legally unsupportable. An invited or allowed entry accomplished by touching (or even opening) a door is not a home invasion. See *People v Toole*, 227 Mich App 656, 659; 576 NW2d 441 (1998) ("There is no breaking if the defendant had the right to enter the building."). That defendant did not "break" into Jones's home does not mean that the trial court should have acquitted him, however. Despite that Ayers did not "break" into the home, Ayers was not authorized to enter it and therefore entered without permission.

The first element of first-degree home invasion is satisfied when a "defendant *either*: 1. breaks and enters a dwelling or 2. enters a dwelling without permission." *People v Wilder*, 485 Mich 35, 43; 780 NW2d 265 (2010) (cleaned up). MCL 750.110a(1)(c) defines "without permission" as "without having obtained permission to enter from the owner or lessee of the dwelling or from any other person lawfully in possession or control of the dwelling." Under this statutory definition, a rational factfinder could readily convict Ayers of first-degree home invasion

because a court order—the PPO—prohibited him from entering onto Jones's property. See *People v Szpara*, 196 Mich App 270, 273-274; 492 NW2d 804 (1992).

Jones testified that after she obtained the protective order, she did not give Ayers permission to contact her and did not invite him to her townhouse. When Ayers first appeared at her home on the day of the events in question, she told him to go away and threatened to call the police. When Ayers returned to her home, Jones testified, he still did not have her permission to enter. Although she was aware of Ayers's plan to give MA some money, she anticipated that MA would have "walk[ed] to go see him." Jones insisted that she complained to the police that Ayers had violated the PPO on the date of the events at issue. And Ayers admitted during his testimony that he was aware of the PPO on the day he entered Jones's home. He conceded that he could have met MA outside of the home to give him the five dollars.

When rendering its ruling that Ayers was guilty of aggravated stalking, the trial court specifically found that the PPO was issued and served on Ayers. Ayers did not dispute that the PPO was in effect on the day he visited Jones's house, and the PPO was admitted in evidence without objection. Neither MA's permission to come into the house (nor Jones's, had it been given) could override the court's order.

In examining the sufficiency of the evidence supporting a conviction, we examine whether "any rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *Taylor*, 245 Mich App at 297. Applying this framework, the trial court's failure to invoke "without permission" as a ground for finding Ayers guilty qualifies as harmless error. Although MA opened the door, the young man did not have the legal authority to admit Ayers into Jones's home. And the evidence supported that Ayers was aware that his entry contravened both the PPO and Jones's expressed desire that he stay out. Had this been a jury trial, the court's failure to instruct on the "without permission" element would have been harmless. See *Neder v United States*, 527 US 1, 17; 119 S Ct 1827; 144 L Ed 2d 35 (1999) ("[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless."). The same rule applies in a bench trial. The record contains no evidence that could rationally lead to a finding that Ayers entered the home legally or "with permission." To the contrary, the record conclusively establishes that Ayers entered without permission; he has not contested that the prosecution proved the remaining elements of first-degree home invasion. Ayers's challenge to the sufficiency of the evidence underlying this conviction therefore cannot succeed.

IV

Ayers next asserts that his counsel performed ineffectively by failing to object to evidence admitted under MRE 404(b). The evidence primarily consisted of text messages sent to Jones and Brantley after Ayers was released on bond pending trial in this case. The messages were threatening and intimidating. According to the prosecution, they evidenced Ayers's motive and intent to maliciously vandalize Brantley's car. Ayers's counsel did not object to the admission of the text messages or the testimony surrounding their admission. Additionally, counsel questioned Jones about Ayers's conduct while Ayers was on bond, which included the details of an argument between the two which ended when Jones stabbed Ayers. None of this evidence was relevant to

anything other than his propensity for violence, Ayers urges, and counsel should have protested its introduction.

Because Ayers frames his argument in terms of his counsel's ineffectiveness, to succeed he must demonstrate that but for his attorney's deficient performance, a different result would have been reasonably probable. *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v Richter*, 562 US 86, 112; 131 S Ct 770; 178 L Ed 2d 624 (2011). Had Ayers's counsel successfully objected to the evidence challenged on appeal, it is highly unlikely that the outcome would have differed.

The prosecution presented a powerful case of Ayers's guilt on the two charges of conviction, consisting of detailed eyewitness testimony bolstered by Ayers's incredible denials. As we have described, Ayers's appearance on Jones's property, combined with his entry into her home and his pursuit of Brantley, satisfied the elements of first-degree home invasion. Ayers has not challenged the sufficiency of the evidence supporting his aggravated stalking conviction, and for good reason. Jones's testimony regarding his visit to her workplace and her description of text messages Ayers sent preceding the post-event messages established that Ayers had engaged in aggravated stalking. Exclusion of the challenged evidence likely would not have produced a more favorable result.

V

Ayers's lastly argues that the trial court erred in assessing 10 points for Offense Variable (OV) 9. The prosecution concedes that OV 9 should have been scored at zero.

"Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *Id.*

MCL 777.39 provides direction for scoring OV 9. The statute states that the trial court should assess 10 points for OV 9 when two to nine victims were placed in danger of physical injury or death. MCL 777.39(1)(c). In this case, only Brantley was placed in danger of physical injury during the home invasion. MA was in the house at the time, but never in danger of physical injury. Jones was outside moving Brantley's car down the street. Therefore, the trial court misscored OV 9.

First-degree home invasion was a class B crime. Ayers's presentence investigation report (PSIR) indicates that his total prior record variable (PRV) score was 30 points, placing him within level D. His OV score at trial was calculated at 36, which put him at OV level V. If OV 9 had been assessed zero points, Ayers's total OV score would have been 26, putting him at OV level IV. MCL 777.63. His minimum sentencing guidelines range would have been only 57 to 95 months had his OVs been scored correctly. MCL 777.63.

The trial court sentenced Ayers below his recommended guidelines range as originally scored to a minimum sentence of 60 months. But because Ayers was sentenced using an inaccurate sentencing range and the corrected score would lead to a different recommended minimum

sentencing range, he must be resentenced.  *People v Francisco*, 474 Mich 82, 88-89; 711 NW2d 44 (2006).

We affirm Ayers's convictions but remand to the trial court for resentencing.  We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Elizabeth L. Gleicher
/s/ Michael J. Kelly